Anthony J. DiGiovanna, J.
This is a special proceeding to review an order of the Commission on Human Rights pursuant to section Bl-9.0 of the Administrative Code of the City of New York. A cross petition seeks enforcement of respondent’s order. That section states that: ‘ ‘ The findings of the commission as to the facts shall be conclusive if supported by sufficient evidence on the record considered as a whole.”
The decision and order, made and entered on November 10, 1967 and adopted by the commission on the same date, were based upon a hearing concluded on April 13, 1967. It appears to me that the requirement as to expeditious disposal after a hearing or review by a court should be equally binding upon respondent. It is entirely inequitable and destructive of the rights of parties to delay a decision for a period of seven months. The importance of prompt disposal of a special proceeding in this court is stated as follows:1 ‘ All such proceedings shall be heard and determined by the court and by any appellate court as expeditiously as possible and with lawful precedence over other matters.”
The necessity of expeditious disposal is evidenced by the provision of section Bl-8.0 (subd. 2, par. c) which grants “ payment of compensatory damages to the person aggrieved by such practice ” without likewise granting to the landlord compensatory damages for losses occasioned by delayed action of the respondent in the event that an order is entered in favor of the landlord.
I refer to that part of the decision which reads as follows: “ pay to complainant Charles Gray the sum of $100 being compensation for the humiliation, outrage and mental anguish suffered by him as a direct result of respondents’ unlawful discrimination. ’ ’
It is my opinion that the respondent holds no power to grant such damages. The clear intention of the Legislature was to permit an award of damages to the extent of actual money loss occasioned to the complainant and not for other subjective injuries. Basically an action for compensatory damages constitutes a tort action which should be brought in a court of law triable by a jury, unless a jury is waived.
Authority for the enactment of chapter 1 of the Administrative Code creating the City Commission on Human Rights was granted by article 12-D of the General Municipal Law where, in section 239-o, it was provided: ‘1 The governing board of any county, city, village or town may by resolution create a commission on human rights.” Nowhere in section 239-q, entitled *3 1 ‘ General duties ’ ’ was any commission given the right to award damages, nor does section 239-r entitled 1 ‘ General obligations ’ ’ extend this power to the respondent.
Pursuant to the authority of section 293 of the Executive Law, entitled 11 State commission for human rights ’ ’ a similar commission was created in the Executive Department. The general powers and duties prescribed in section 295 authorize the holding of hearings and permit an award of compensatory damages. Obviously the city commission was modelled on this section. Section 297, prescribing the procedure to be followed upon the filing of a complaint and the investigations in connection therewith, provides in paragraph c of subdivision 2 that the commission state its findings of fact and serve an order enjoining unlawful discrimination and also for the payment of compensatory damages to the person aggrieved by such practice. The very nature of a provision awarding damages only to a complainant and not to a landlord is discriminatory. Landlords against whom false complaints are filed can be damaged monetarily to even a greater extent than an individual complainant. The discriminatory nature of such provision invalidates the provision for damages.
In this case there was no proof on the issue of damages submitted to the hearing commissioner. The complainant is a 25-year-old single male who lived with his single brother in a 3½ room apartment for which his brother paid the rent. Although he claimed at the hearing that he was a student and that it was upon that basis that the Welfare Department undertook to pay his rent for this apartment, the nature of the studies being pursued by this 25-year-old student is not set forth nor the school which he attends nor the courses which he has taken. There is not the slightest degree of proof in this regard that he was in anywise humiliated, outraged and anguished by the result of the landlady’s action. Consequently this court strikes from the order of the respondent the provisions for damages.
With respect to the merits of the order finding that the landlady and her ‘1 renting agent ’ ’ were guilty of unlawful discrimination, this court finds that the record amply sustains the findings against the landlady but not against the ‘ ‘ renting agent.” The latter was an aged woman who was a tenant in the building and who performed some services for the landlady who is also an aged person. There is no evidence in the record to indicate that the landlady had any direct contact with any of the parties herein. The landlady’s husband is alleged to be a 90-year-old practicing attorney. Neither the landlady nor the *4 “ renting agent ” was called as a witness to refute any of the testimony given by the several persons on behalf of the complainant. The “ renting agent ” died on November 19,1967.
The undisputed testimony of members of the respondent sufficiently established that the superintendent of the building had exhibited the apartment to the complainant who had obtained a list of available apartments from Operation Open City, an organization working in conjunction with the respondent. When shown one apartment he was told that another apartment was also available. There were no other Negroes living in this apartment house. When the superintendent took him to the “ renting agent ” she, ostensibly acting under orders of the landlady, told him that there were no available apartments and that the advertisements upon which the respondent based its listing were erroneous. The following day an inspector for the commission, a white woman, after informing the “ renting agent ” that she desired to rent the apartment for her brother, who was on welfare, was permitted to give a deposit for the apartment and received a receipt therefor. On the next day she returned to the apartment with the complainant and several other persons connected with the respondent. Confusion existed. Nevertheless the ‘ ‘ renting agent ’ ’ accepted from the complainant checks issued by the Welfare Department in the total sum of $139.70 for the payment of one month’s rent and one month’s security and gave him a lease, unsigned as yet by the landlady, and also gave him the keys to an apartment just vacated by a former tenant. When attempting to enter the apartment on the following day, the complainant found that the lock had been changed. Upon further conversation with the “ renting agent ” she claimed firstly, that the landlady refused to rent the apartment to a welfare recipient, and further that there were no apartments in fact available. Thereupon the present proceedings were commenced.
The only testimony offered on behalf of the landlady and ‘ ‘ renting agent ’ ’ was that of an attorney who had conversations with them. It was his contention that the landlady had the right to refuse to rent the apartment to a recipient of welfare because of unhappy experience with a welfare tenant which had resulted in the vacancy then existing.
That argument might have been tenable except for the uncontradicted testimony in the record that there were other welfare recipients as tenants with whom the landlady had no difficulties and further, the fact that the offer to rent had been made to the first investigator who had advised the ‘ ‘ renting agent ’ ’ that the apartment was for her brother who was a recipient of welfare.
*5 Consequently the court must find that there was substantial evidence warranting the findings of the commission concerning discrimination.
A further provision of the order required the landlady to make available for rental to the complainant the same apartment or another apartment of comparable size and rental. Three weeks after the complaint was filed, the landlady rented the apartment to another, a white person.
I hold that that portion of the order requiring the offer to rent apartment 4F is stricken. In Matter of Commission on Human Rights v. City Builders (53 Mise 2d 1, 2) it was said:
‘1 While the proceeding was pending before the petitioner, the apartment was rented to another tenant, who presently occupies it. This tenant was not initially a party to the proceeding. When this matter first appeared in court, the Justice then presiding ordered that he too be joined in the application. Such was done, and he has answered. On the papers submitted it is not shown that he had any knowledge of the proceeding before the petitioner, or that he in any way conspired with the owner.
‘ ‘ Accordingly, the court is of the opinion that to enforce the first part of the order would be harsh and inequitable as to the present tenant, who seems to be an innocent party.” For the same reason I direct that that provision be stricken.
With respect to the remaining injunction contained in paragraph 2, concerning the offer of another apartment comparable in size and amount of rent to apartment 4F, I direct that the provision be added that the complainant be required to exercise his right of rental within five days after notice is sent to him by registered mail that such apartment is available. It would be inequitable to permit an unlimited time to elapse before the complainant makes up his mind whether or not to take the offered apartment.
In all other respects the order is affirmed.
Referring again to the findings concerning the award of compensatory damages, I am of the opinion that fairness requires equal protection not only of the one who complains but also of a landlord against whom a false accusation is filed. Obviously the practice of withholding decisions for the period of seven months, as was done in this case, is in conflict with subdivision 2 of section Bl-8.0 of the Administrative Code which restricts the posting of a notice on the door of the housing accommodations to a period of ten days. It is also in conflict with that portion which reads in part: “ If the commission, after such investigation, shall determine that there is probable cause to credit the allegations of the complaint, or if the chairman after such review,
*6 6 56 MISCELLANEOUS REPORTS, 2d SERIES shall determine that there is such probable cause, the commission shall immediately endeavor to eliminate such unlawful discriminatory practice ” (italics added). And then follows prescribed procedure. Certainly the harm done to a landlord, against whom unfounded complaints are filed, will be substantially greater than that to the complainant. Some legislative provision or amendment should be made for the protection of such landlord. Accordingly the order of the commission is modified on the petition and cross petition to the extent that paragraph 1 shall remain intact, paragraph 2 shall be changed as indicated above, and paragraph 3 shall be deleted. Sueeolk Roadways, Lsrd., et al., Plaintiffs, -v. T. Bayles Mmtrsa et al., Constituting the Suffolk County Water Authority, et al., Defendants. Supreme Court, Special Term, Suffolk Comity, February 16, 1968. Attorney and client — compensation — ■ attorneys who, without good cause, withdrew when adversary moved for summary judgment, are not entitled to compensation.^ At a critical moment when plaintiffs were faced with a motion by defendants for summary judgment, plaintiffs’ attorneys moved for leave to withdraw and to have a lien fixed for the fees due them. They say that the plaintiffs had engaged another law firm to prosecute a related action, and that the plaintiffs had refused to discuss an offered settlement in this action. But these decisions were within the clients’ rights. Moreover, a year had elapsed since the related action was begun and six months since it was discontinued. The withdrawal by these attorneys was without good cause, and therefore forfeits their claim to compensation, and hence their motion is denied. White é Case for plaintiffs. Koffler, Flower & Plotha, withdrawing counsel for plaintiffs. William R. Ceiled, J. Motion for leave to withdraw as counsel for plaintiffs and to have a lien fixed for the amount of fees allegedly due for legal services rendered. This motion was originally granted on default. Plaintiffs’ default was vacated and a hearing was held before this court. Movants contend that they were justified in withdrawing as counsel and are entitled to be compensated for the services allegedly rendered to plaintiffs. Plaintiffs maintain that movants are not entitled to any compensation as the withdrawal was without good and sufficient cause. They argue that this is especially true since the withdrawal came during the time plaintiffs were faced with a motion for summary judgment brought on by defendants.
*7 There are two issues to be decided by the court:
■ 1. Are the movants entitled to compensation for their alleged services rendered?
2. If so, then what compensation are they entitled to?
It is elementary that there must be “mutuality” in order for a contract to be valid. The relationship between an attorney and client is a contractual one. However, there is an exception to this rule of “ mutuality ” in the case of an attorney and his client. A client may discharge an attorney, with or without cause, at any time (Matter of Krooks, 257 N. Y. 329). Yet an attorney who withdraws voluntarily, without cause, forfeits his lien for compensation (Halbert v. Gibbs, 16 App. Div. 126).
Why should an attorney’s obligation be so exacting? What makes an attorney so different?
The court in the case in Eisenberg v. Brand (144 Misc. 878, 879) answered these questions: “ The office of a lawyer is one of great importance. He is schooled in the substantive law, has studied the intricate rules of practice, and is familiar with the pitfalls made in this complex world for the uninitiated. He has the power of expression and is skilled in argument. The road he travels is technical, but he knows the turns — others get lost. * * * The profession demands of him that he stand by under the most trying conditions — lest, unprotected, his client fall down harder than justice requires. * * * he should not desert in the midst of the battle. The relation of attorney and client is a sacred one, and it binds the lawyer, although not the client, to continue to represent him until he is properly relieved.”
Accordingly, where an attorney withdraws without good and sufficient cause, his lien is automatically forfeited (Isser v. Berg, 38 Misc 2d 957). The language of the court in the Eisenberg case (supra p. 879) sets forth this principle clearly: “ It is clear that an attorney cannot leave his client in the middle of a matter, because he does not supply him with money, or by reason of any other difficulty, without running the risk of losing the benefit of that relation. * * * The relation of attorney and client lacks mutuality. It favors the client. He may leave at any time without penalty. The attorney has a right to quit, too (although honor bound to stay), but he is severely penalized. When he withdraws, he breaks the charm that sustains his lien. He himself has destroyed the relationship necessary to support that equitable right that ensured payment of his fee.”
Conversely, withdrawal is not fatal to an attorney’s lien where there is good and sufficient cause for withdrawal. Canon 44 of the Canons of Professional Ethics provides, in part: “The *8 right of an attorney or counsel to withdraw from employment, once assumed, arises only from good cause. Even the desire or consent of the client is not always sufficient. The lawyer should not throw up the unfinished task to the detriment of his client, except for reasons of honor or self-respect. If the client insists upon an unjust or immoral course in the conduct of his case, or if he persists over the attorney’s remonstrance in presenting frivolous defenses, or if he deliberately disregards an agreement or obligation as to fees or expenses, the lawyer may be warranted in withdrawing on due notice to the client, allowing him time to employ another lawyer. So also when a lawyer discovers that his client has no case and the client is determined to continue it; or even if the lawyer finds himself incapable of conducting the case effectively. ’ ’
Did the movants have just cause for their withdrawal?
There is no claim by movants that plaintiffs have insisted upon an “ unjust or immoral course in the conduct of [their] case” or anything else which caused movants to “throw up the unfinished task * * * for reasons of honor or self-respect.”
What, then were the reasons given for movants’ withdrawal?
Movants assert that there were accusations made by plaintiffs that “ counsel lacked good faith ”. The plaintiffs denied these accusations.
It is interesting to note that the alleged accusations were not cited as a reason for movants’ withdrawal at the time of such withdrawal. Furthermore, movants continued to represent the plaintiffs at least a year after these accusations were allegedly made and plaintiffs continued to allow movants to represent them after the alleged accusations occurred.
Should not movants, if these accusations were seriously made, have withdrawn immediately?
The movants, by not acting swiftly, and waiting for at least a year, have waived any objection that the alleged accusations were just cause for withdrawal. The movants’ lack of action indicated that they did not consider these alleged accusations seriously.
Movants contend that plaintiffs ‘ ‘ brought other counsel into the case over their objections and they were justified in withdrawing ”.
Movants maintain that the law firm of White & Case interfered with their handling of the above-entitled matter by prosecuting a related but independent action which movants refused to undertake. The commencement of the independent action and the alleged interference by White & Case occurred in the Spring *9 of 1966. The independent action was discontinued in the Fall of 1966. However, the movants’ withdrawal came a year after White & Case instituted the independent action.
Did it take a year for movants to learn that the institution of the independent action by White & Case was interfering with their handling of the instant action? Why did not the movants notify plaintiffs that the institution of this independent action would cause them to consider withdrawal?
The court agrees with movants’ statement that an attorney has good cause for withdrawal “where the client insists upon introducing into a case a counsel who is professionally or personally objectionable to the attorney retained therein ” (Tenney v. Berger, 93 N. Y. 524). However, movants have never stated that the firm of White & Case was professionally or personally objectionable to them. Furthermore, in the case of Tenney v. Berger (supra), relied upon by the movants, the objected-to co-counsel had actually been employed by the plaintiff in the very same action that plaintiff’s attorney was handling and plaintiff’s attorney immediately objected and withdrew.
There is no evidence, in the instant action, that White & Case was employed by plaintiffs (except in the independent action) prior to movants’ withdrawal. Furthermore, such withdrawal occurred almost a year after movants claimed White & Case participated in an objectionable manner in instituting the independent action and more than six months after the prosecution of the independent action had ceased.
The movants also advance the ground that the plaintiffs refused to ‘ ‘ discuss ’ ’ an offered settlement and therefore they were justified in withdrawing.
The plaintiffs informed the movants that the offered settlement was not acceptable to them under any circumstances. WUiat good would further discussions serve?
It is the client who controls the decision as to whether a settlement offer is to be accepted. The plaintiffs made that decision. This decision is binding upon the attorney even though not in accordance with his advice.
Certainly, a refusal to accept a settlement, even though favored by an attorney, is not cause for a withdrawal by the attorney (Mrozinski v. Marinello, 46 Misc 2d 637).
Even if the court were to concede, for the sake of argument, that the alleged reasons cited by movants would under normal circumstances furnish good and sufficient cause for movants’ withdrawal, they do not justify movants’ abandonment of plaintiffs in the face of a critical summary judgment motion. The movants were attorneys of record for plaintiffs for three *10 years and were the only ones fully familiar with the facts and law regarding the summary judgment. The movants owed the plaintiffs the duty to represent them at least until the final decision of the critical summary judgment motion. Thus in Eisenberg v. Brand (144 Misc. 878, 879 supra), the court, in considering whether the withdrawing attorney was entitled to a lien, stated: ‘‘ In this instance, this attorney cannot be accused of deserting or in any way abandoning his client. There was no emergency at the time he wrote the letter [requesting substitution of attorneys].”
The court is loathe to deny an attorney compensation for services performed. However, the court also recognizes that he is aware of his obligation and duties to a client.
This awareness takes place from the moment he is a neophyte in the study of law. In law school he is made cognizant of the difficulties of the legal profession and the obligations and duties which will be expected of him by a client.
He is given the choice of assuming these obligations. His admission to the Bar is a clear indication that he has chosen to fulfill these obligations.
He again reaffirms his intention to be bound by these obligations and advertises this fact to the world when he hangs out his shingle.
The law recognizes that these obligations to a client are difficult and severe. Therefore these obligations are only imposed once an attorney decides to acquiesce in the establishment of the attorney-client relationship as evidenced by a retainer agreement, whether oral or written.
Now the attorney cannot turn back. He is duty bound to represent the client to the best of his ability. He cannot voluntarily withdraw without just cause. If he does so, then he must pay the penalty — forfeiture of his compensation.
The mere fact that the retainer is not as profitable as first imagined is no excuse for withdrawal. Neither is a rationalization of various events, none of which seemed important to the movants at the time, justification for withdrawal under the facts presented herein.
Movants’ motion for compensation is accordingly denied.