Argued September 23, 1970, affirmed January 14, petition for
rehearing denied February 9, petition for review
denied April 20, 1971

WILLIAMS, *Appellant—Cross-Respondent, v.*
DONALD H. JOYCE, *Respondent,* MARGARET C.
JOYCE, *Respondent—Cross-Appellant.*

479 P2d 513

*Jacob B. Tanzer,* Solicitor General, Salem, argued the cause for appellant—cross-respondent. With him on the briefs were Lee Johnson, Attorney General, Salem, and H. J. Belton Hamilton, Thomas N. Trotta, and Victor Levy, Assistant Attorneys General, Portland.

*William A. Martin,* Portland, argued the cause for respondents—cross-appellant. With him on the briefs

were Davis, Jensen, Martin & Robertson, and Donald H. Joyce, Portland.

Before SCHWAB, Chief Judge, and FOLEY and FORT, Judges.

SCHWAB, C. J.

This matter arose out of a contention by the complainant, Mrs. Nicholson, that the petitioners, Mr. and Mrs. Joyce, refused to rent an apartment to her because she is a Negro.

The complainant appeals from a circuit court decree setting aside certain provisions of an administrative order, and petitioner Margaret Joyce cross-appeals. Initially, this was an administrative proceeding under ORS ch 183 (Administrative Procedures Act) to determine issues of discrimination in housing based on race and color, ORS ch 659 (Enforcement of Civil Rights).

The hearing was before the Commissioner of Labor (hereinafter referred to as the commissioner) and a tribunal of three citizens appointed by him under the provisions of ORS 659.060(5).[1]

The relief sought was an adequate remedy for the complainant and other persons similarly situated which would eliminate the effects of any discrimination found, and which would carry out the policy of Ore-

---

[1] ORS 659.060(5) provides:

"Nothing stated in ORS 659.010 to 659.110 shall be construed to prevent a settlement of any case scheduled for hearing under the provisions of ORS 659.010 to 659.110 by conciliation, conference and persuasion, nor to prevent the commissioner from appointing a special tribunal to hear and determine matters of fact under ORS 659.010 to 659.110, reserving to himself the conclusions of law and formulation of an order appropriate to the facts as found."

gon's civil rights law. The commissioner found discrimination by both petitioners and entered a cease and desist order which provided monetary and other remedies. The Joyces petitioned the circuit court to review the commissioner's determinations under ORS ch 183.

Upon review the circuit court issued its decree reversing and setting aside the administrative order in its entirety as to the petitioner Donald Joyce, and setting aside the following provisions of the order as to Margaret Joyce:

"(1) The agency requirement that for two years the respondents make periodic reports in writing to the agency concerning the terms and conditions under which their rental units are offered for rent.

"(2) The agency requirement that the respondents pay the reasonable future out-of-pocket expenses of the complainant if she should move from her interim apartment, required by respondents' continuing discrimination, to the apartment they had refused to rent to her.

"(3) The agency monetary award to the complainant to remove the effects of the frustration, anxiety and nervousness suffered by her as an effect of the discrimination."

As to Margaret Joyce the court affirmed so much of the administrative order as directed her to cease and desist from the practice of discrimination and to pay to Mrs. Nicholson certain out-of-pocket expenses totaling $42.89.

The issues raised by the assignments of error on appeal and cross-appeal are:

(1) The sufficiency of the evidence of discrimination;

(2) The commissioner's authority to award compensatory damages under ORS ch 659;

(3) The commissioner's authority to require reports from a person he has found to have violated the provisions of ORS 659.033;

(4) The constitutionality of ORS 659.031. We deal with the specific assignments of error in the course of discussing the issues raised by them.

## THE SUFFICIENCY OF THE EVIDENCE OF DISCRIMINATION

The complainant appeals from the decree of the trial court finding no evidence of discrimination on the part of Donald Joyce. Margaret Joyce appeals from the finding of the trial court that there was evidence of discrimination by her.

■ Except in certain statutorily-specified instances, judicial review of the findings of administrative agencies does not confer upon the reviewing court the right to try the cause *de novo*.

"\* \* \* [T]he reviewing court is not granted the power to weigh the evidence and substitute its judgment as to the preponderance thereof for that of the agency. The extent to which a reviewing court should review the action of an administrative agency has been expressed by this court, as follows:
"'\* \* \* Generally, they go no further than to determine whether the agency (1) acted impartially; (2) performed faithfully the duties delineated in the legislative acts which conferred jurisdiction upon it; (3) stayed within its jurisdiction; (4) committed no error of law; (5) exercised discretion judiciously and not capriciously; and (6) arrived at no conclusion which was clearly wrong.'
\* \* \*." *Bay v. State Board of Education*, 233 Or 601, 605, 378 P2d 558 (1963).

Because the sufficiency of the evidence is in issue, we set forth relevant testimony and other evidence in greater detail than would otherwise be necessary.

In 1943, Mrs. Joyce and her mother, Mrs. Forken, purchased a duplex apartment building, 712-718 N.E. 20th Avenue, in Portland, with funds provided by Mrs. Forken and Mrs. Joyce. The duplex apartments are side-by-side, with separate basements, separate garages and separate entrances. At the time of the purchase Mr. Joyce was in the military service. Mrs. Joyce testified that the premises were required so that her mother, legally blind, would have a place to live in familiar surroundings, and in the same neighborhood where she had resided since 1912. Title of record at all times forward from the date of the purchase was in Mr. and Mrs. Joyce and Mrs. Forken.

In 1947, Mr. Joyce quitclaimed his interest in the property to his wife and mother-in-law by a delivered, but unrecorded deed.

In September of 1945, when Mr. Joyce returned from the military service, Mrs. Forken moved to 718 N.E. 20th Avenue. Mr. and Mrs. Joyce occupied 712 N.E. 20th Avenue until 1957, when, because of the size of their family, they moved to a newer home. Mrs. Forken continued to live at 718 N.E. 20th Avenue.

Mrs. Joyce planned that 712 N.E. 20th Avenue be maintained for the benefit of Mrs. Forken, and that the income derived therefrom be used for Mrs. Forken's support and pleasure. In 1960, the Joyces acquired a contiguous parcel of real property known as 702-708 N.E. 20th Avenue as tenants by the entirety with a view toward enhancing the value of the whole by virtue of assembly.

From 1957, 712 N.E. 20th Avenue was rented to a series of tenants. During the course of their marriage the Joyces have acquired other property, all with a profit or income motive. Donald Joyce participated in the management, operation and maintenance of all of the properties, including the property in question. His joint bank account with his wife was the repository of rental payments and was used to pay expenses incident to the rentals. Newspaper ads, advertising 712 N.E. 20th Avenue for rent, were paid from that account. His office phone number was used in the rental ads. He personally sent letters as a landlord to tenants he wished to have vacate the premises. He billed tenants for rent and oil. The letters and billings were on his stationery and designated his office as the place for payment. The petitioners jointly shared all business expenses involved in the operation of 712 N.E. 20th Avenue, and filed joint tax returns, sharing the income. No part of the income or expenses of 712 N.E. 20th Avenue was shared by Mrs. Forken.

On June 11, 1967, an ad placed by the petitioners appeared in two Portland newspapers specifying that the apartment in question was for rent. On that day the complainant and her fiance, now her husband, both Negroes, went apartment hunting. They read the ad, called the listed number, and were advised that it was still available. They went to the premises. A "For Rent" sign was in the window. They knocked, and when Mrs. Joyce answered, asked to see the apartment. Mrs. Joyce responded that "it was rented," and refused to explain why the "For Rent" sign was still in the window. The couple left and shortly thereafter the complainant telephoned the ad number again. An elderly lady, apparently Mrs. Forken, responded and asked several questions regarding the identity of the

caller. The complainant lied so as to mask her identity, and the lady told her to come see the apartment. The next day the complainant called again, and in response to her inquiry was told by the same lady that the apartment was still available for rent.

On June 14, a field investigator of the Civil Rights Division of the Bureau of Labor, Mr. Rogers, began his investigation of Mrs. Nicholson's complaint. Through phone calls and a personal inspection of the premises, conducted by Mrs. Forken, he determined that the apartment was still vacant and available for rental. On June 15, Mr. Rogers contacted Donald Joyce at his office regarding the complaint. He was told at that time that the apartment was rented. Mr. Joyce then, and again on July 11, proceeded to specify terms and conditions of age and religion for tenancy which would prevent complainant and her fiance from qualifying. No religious standards had ever been required of previous tenants. Mr. Joyce further told Mr. Rogers that Negroes could not qualify for tenancy in the apartment because they would be incompatible with his mother-in-law who occupied the adjoining apartment.

Mr. Rogers made several attempts to arrange for an interview between the complainant and the Joyces. On June 28, Mr. Joyce refused to meet or discuss the matter further. The "For Rent" sign remained in the window at 712 N.E. 20th Avenue continuously from June 11, 1967, until at least July 11, 1967, with the exception of 1½ days from the evening of June 11, 1967, to June 13, 1967.

■ The trial court apparently found that Donald Joyce had not committed an act of discrimination, because he did not participate in the first refusal, and because he was not an owner of the premises. Mr. Joyce cannot prevail on either ground.

ORS 659.033[2] forbids, and the tribunal found, a continuing process of discrimination which began with Mrs. Joyce's initial act and continued at least to the day of the hearing. It continued so long as the petitioners refused to rent to the complainant and her husband.

By setting up restrictions of age and religion applicable only to the complainant among the tenants and prospective tenants, Mr. Joyce violated ORS 659.033(1) (c) which forbade him to "Make any distinction, discrimination or restriction against a [prospective lessee or occupant] * * * in the * * * terms, conditions or privileges relating to the * * * rental, lease or occupancy of real property" due to race.

---

[2] ORS 659.033 provides:

"(1) No person engaged in the business of selling real property shall, solely because of race, color, religion or national origin of any person:

"(a) Refuse to sell, lease or rent any real property to a purchaser.

"(b) Expel a purchaser from any real property.

"(c) Make any distinction, discrimination or restriction against a purchaser in the price, terms, conditions or privileges relating to the sale, rental, lease or occupancy of real property or in the furnishing of any facilities or services in connection therewith.

"(d) Attempt to discourage the sale, rental or lease of any real property to a purchaser.

"(2) No person shall publish, circulate, issue or display, or cause to be published, circulated, issued or displayed, any communication, notice, advertisement or sign of any kind relating to the sale, rental or leasing of real property which indicates any preference, limitation, specification or discrimination based on race, color, religion or national origin.

"(3) No real estate broker or salesman shall accept or retain a listing of real property for sale, lease or rental with an understanding that a purchaser may be discriminated against with respect to the sale, rental or lease thereof solely because of race, color, religion or national origin.

"(4) No person shall assist, induce, incite or coerce another person to commit an act or engage in a practice that violates this section."

By refusing to consider the complainant as a tenant, and by ratifying and continuing his wife's refusal to show the apartment to the complainant, Mr. Joyce violated ORS 659.033(1)(d), which forbade him to "Attempt to discourage the * * * rental or lease of any real property" to a prospective occupant or lessee due to race.

Further, there is ample evidence that Mr. Joyce's conduct was violative of ORS 659.033(4), which forbade him to "assist" his wife "to commit an act or engage in a practice that violates this section."

The Joyces, man and wife, acted as normal landlord joint venturers in dealing with their real property used for rental, profit and investment. They shared the profits from the property as well as the responsibilities and control thereof. The refusal to consider the complainant was joint and continuing.

■ Even if "ownership" was necessary to a violation of ORS 659.033, there is ample evidence here to support a finding that Donald Joyce was an owner. The quitclaim deed was not recorded. Mr. Joyce remained as a record title owner of the duplex in question. He testified that the purpose of the unrecorded quitclaim deed was to ease any probate problems in the event of his death. It did not reflect a change of ownership or management practices. His own affidavit in a suit to enjoin the proceedings which culminated in this appellate review alleged that he was a joint owner of the property in question.

■ Mrs. Joyce argues that the trial court erred in failing to find that the administrative tribunal was bound by what she characterizes as the unimpeached and uncontroverted testimony of the complainant's witness, Miss Ellen Lavin, who testified in effect that she rented

the apartment in early June. Miss Lavin's specific testimony was that she talked to Mrs. Joyce about renting the premises in question during the first part of June 1967, and that Mrs. Joyce told her that the rent was already paid to June 20. Both her testimony and that of the petitioners was equivocal on the issue of when, if ever, all parties understood a binding rental agreement was reached. Miss Lavin testified that she expected occupancy on July 1, 1967, and expected Mrs. Joyce to hold the premises for her until that date. Her first rent check, delivered June 28, 1967, was marked "Rent 712 Northeast 20th Avenue from July 1, '67 to August 1, '67," and she testified that she paid two subsequent months' rent. In support of her position Mrs. Joyce cites several Oregon cases all generally to the same effect, including *State v. Cummings*, 205 Or 500, 288 P2d 1036, 289 P2d 1083 (1955), in which the court, at 531, said:

"* * * Evidence concerning facts which does not discredit itself, which is not inherently improbable and which comes from witnesses who have not been discredited, contradicted or impeached, generally demands acceptance by the trier of the facts * * *"

The rule there set forth is not determinative of the issue in the case at hand, for here, the thrust of the testimony of Miss Lavin was contradicted by other evidence. Miss Lavin, a client of Mr. Joyce, was in his office prior to the June 11 incident. At that time Mr. Joyce discussed a possible tenancy of the premises with her. The Joyces continued to attempt to rent the apartment to the public after that time. Miss Lavin did not deliver a rental check until June 28, two weeks after the discriminatory incident with complainant. The check was not cashed until the day formal charges of

discrimination were served on the Joyces. Miss Lavin never moved into the apartment, although she left a few boxes of her possessions there. At the time of the administrative hearing in September of 1967, Miss Lavin testified that her address was elsewhere. Contrary to the practice with other tenants, during the period in which Miss Lavin was assertedly the tenant, the electrical service for the apartment was in Mr. Joyce's name, rather than that of his asserted tenant. On similar facts, a New York court upheld the agency finding that a lease was not a bona fide arrangement. *Feigenblum v. Commission on Human Rights*, 53 Misc2d 360, 278 NYS2d 652 (1967).

There was ample relevant evidence that a reasonable mind could accept as adequate to support the administrative finding of discrimination and violation of ORS 659.033 by the petitioners and each of them.

## COMMISSIONER'S AUTHORITY TO AWARD COMPENSATORY DAMAGES UNDER ORS CH 659

■ In the case at bar, an administrative award of $200 was made to the complainant for humiliation, frustration, anxiety and nervousness, and an administrative award of $140 was made as contingent moving expenses. On appeal, the trial court ruled that, although he felt the award for humiliation was nominal, the agency had no authority to make such an award, no matter how reasonable. With regard to the moving expenses, he properly found that moving expenses were a legitimate item of compensatory damages in an appropriate case, but that such an award was not justified by the facts of the case at hand. We turn first to the principal question—that of allowance of damages for humiliation.

Damages for mental suffering in the absence of physical injury have long been authorized in judicial proceedings in the courts of this state. *Hinish v. Meier & Frank Co.*, 166 Or 482, 113 P2d 438, 138 ALR 1 (1941), involved an action for damages for invasion of the right of privacy. The defendant, without plaintiff's knowledge, had signed the plaintiff's name to a telegram sent to the Governor of Oregon. In discussing damages the court said:

> "The objection is urged that the law does not give redress for mental anguish alone, and that no other damage is alleged in the complaint in the instant case. The rule invoked is the law in this state * * *. But it is well settled that where the wrongful act constitutes an infringement of a legal right, mental suffering may be recovered for, if it is the direct, proximate and natural result of the wrongful act * * *.
>
> "The damages may be difficult of ascertainment, but not more so than in actions for malicious prosecutions, breach of promise of marriage, or alienation of affections, and in many cases of libel, slander and assault. The law has never denied recovery to one entitled to damages simply because of uncertainty as to the extent of his injury and the amount which would properly compensate him." 166 Or at 506.

*Hovis v. City of Burns*, 243 Or 607, 612, 415 P2d 29 (1966), upheld an award to a widow for mental anguish resulting from the city's unauthorized act of disinterring her husband's remains. See also *Tollefson v. Price*, 247 Or 398, 430 P2d 990, 33 ALR3d 149 (1967).

Courts in other jurisdictions have ruled that an award for mental anguish can be made if it results from discriminatory practices.

In *Solomon v. Pennsylvania R. Co.*, 96 F Supp 709 (SD NY 1951), $500 was awarded for humiliation when

a Negro was forced to move from her seat to a Jim Crow railroad car. No physical injury was proved or required to be proved.

In *Browning v. Slenderella Systems*, 54 Wash2d 440, 341 P2d 859 (1959), an award for nominal damages was made when the court found that a Negro woman was embarrassed by not being served in turn and by her knowledge that the failure to serve her was because of her color. The award was upheld despite the fact that the court found that the plaintiff had not suffered any public humiliation and that the evidence was insufficient to prove severe emotional distress, stating:

> "Damages may be had for mental or emotional distress, even in the absence of any physical injury, when caused by a wrongful act intentionally done. [Citing cases.] An act of discrimination in violation of a statute must be classed as a wrongful act intentionally done." 341 P2d at 863.

After noting that the "distress" usually must be severe, the court went on to state that, although it did not accept it, the argument could be made that "severe emotional distress" can be presumed from any unlawful discrimination.

> "It may well be that the difficulties of proof of compensatory damages in such cases indicate that states such as Iowa, which permit punitive or exemplary damages, have a more realistic approach to dealing with the problem of discrimination than we do.
>
> "These difficulties of proof may be the reason that some states provide that a person discriminated against may recover a penalty of a minimum amount and such other damages as may be established, and others establish the minimum and maximum amounts which can be recovered in a civil action * * *." 341 P2d at 866.

In *Gray v. Serruto Builders, Inc.*, 110 NJ Super 297, 265 A2d 404 (1970), the court stated that:

"\* \* \* Indignity must be the natural, proximate, reasonable and foreseeable result of racial discrimination. As such, it should be held compensable \* \* \*. This result would comport with the rule generally prevailing in other jurisdictions that a plaintiff is entitled to recover either nominal or actual damages for mental suffering caused by racial discrimination.

"\* \* \* \* \*

"While actual damages will be awarded when they can be proved, nominal damages will be presumed from the encroachment of an established right \* \* \*." 110 NJ Super at 315.

The right of an administrative agency to award damages for racial discrimination has not heretofore been considered by an Oregon appellate court. Racial discrimination laws are of recent origin and there is a paucity of appellate decisions. The New York civil rights statute authorizes an administrative award of compensatory damages to the person aggrieved by discriminatory practices. Executive Law § 297, subd. 4, par. c, clause iii (McKinney 1951). Whether the authority to award "compensatory damages" authorizes the award of damages for humiliation is still unresolved by the highest court of that state. The New York trial courts have split on the question.[9] The Su-

---

[9] Commission on Human Rights of the City of New York v. Knox Realty Corp., 56 Misc2d 806, 290 NYS2d 633 (1968), states that:

"\* \* \* [M]ental anguish and suffering are proper elements of damage to be taken into consideration where people aggrieved have been deprived of their undoubted basic civil rights. \* \* \* [W]here \* \* \* the order made by the Commission for compensatory damages rests on a statutory base, it should not be interfered with by the court, in the absence

preme Court, Appellate Division, Second Department, an intermediate appellate court, held, in *State Division of Human Rights v. Luppino*, 313 NYS2d 28 (1970), that the Commissioner of State Division of Human Rights had no power to award either attorney's fees to complainants, or monetary damages for mental anguish or pain and suffering of complainants because of racial discrimination with respect to rental of apartments.

The court held that the section of the New York statute which states that a person who files a complaint with the Division of Human Rights is precluded from bringing an action in court on the same claim gave individuals a choice. They could elect to sue in court and recover all damages which they could establish, including mental anguish, or they could elect to seek administrative relief under the Human Rights Law.[4] By electing to seek the latter relief, complainants could obtain directives and orders of benefits to themselves and others in their position, but by doing so they

---

of an improper exercise of discretion by the Commission * * *." 290 NYS2d at 636.

Herman v. Booth, NYLJ, 12/26/67, is cited in Commission on Human Rights of the City of New York v. Hardenbrook Realty Corp., 57 Misc2d 430, 292 NYS2d 775 (1968), as being similar in conclusion.

Hardenbrook and Weynberg v. City of New York Commission on Human Rights, 56 Misc2d 1, 287 NYS2d 1002 (1968), both refused to allow the award. In the former case, the court did not face the question, but ruled that such an award would not be proper in the particular case, because there was evidence that the complainant did not suffer any humiliation as a result of the discrimination. In the latter case, the court ruled that the commission could not make an award for mental suffering.

[4] ORS ch 659 does not contain a provision similar to this New York provision.

limited their recovery for damages to actual out-of-pocket expenses.

We are more persuaded by the logic of the dissenting opinion in *Luppino* which argued that the New York law provided a remedy for the results of discriminatory practices—"a remedy not theretofore existing for a practice not theretofore considered to be actionable."

> "The aim of the law was manifestly to achieve the social objective of deterring racial discrimination in housing by providing a civil remedy against the transgressor for the benefit of the injured party. The law empowered the Commissioner * * * to impose a variety of sanctions * * * among which was the 'awarding of compensatory damages to the person aggrieved by such practice, as, in the judgment of the division will effectuate the purpose of this article' (Executive Law § 297, subd. 4, par. c, clause [iii]).

> "We must read the term 'compensatory damages' in the light of settled precedent. Both within the ambits of tort law * * * and contract law * * * it has been held that an award for mental anguish arising from humiliation represents compensatory damages for a breach of the duty owing to the injured party. The violation of a civil right under the Executive Law may be categorized as a wrong * * *.

> "Nothing in the statute suggests that the Commissioner was shorn of the power to make such an award; there is no exception carved out of the term 'compensatory damages', removing his power to give an award for mental suffering as a traditional component of fair compensation * * *." 313 NYS2d at 34.

In New Jersey, a lower court, in *Jackson v. Concord Company*, 101 NJ Super 126, 243 A2d 289 (1968), stated that the New Jersey Law Against Discrimina-

tion⑨ did not give the Director of Division on Civil Rights the power to grant compensatory damages aside from those specifically listed in the Act. In reaching this decision the lower court commented that:

> "The term 'compensatory damages' is generic and encompasses all damages in satisfaction of or in recompense for the loss or injury sustained * * *. In the instant case, it would include not only out-of-pocket disbursements and expenses, but also compensation for humiliation, mental suffering and time spent in vindicating the right * * *." 101 NJ Super at 133.

The New Jersey Supreme Court, in *Jackson v. Concord Company*, 54 NJ 113, 253 A2d 793 (1969), reversed the lower court and ruled that the Director of Division on Civil Rights could award compensatory damages for the additional rental and traveling expenses complainant incurred because he was wrongfully denied an apartment. The court was not faced with, and did not consider, the question of compensation for mental suffering.

There is no constitutional impediment which bars the legislature from authorizing an administrative agency to award damages.

In *Mallatt v. Luihn et al*, 206 Or 678, 294 P2d 871 (1956), the Oregon Supreme Court upheld a statute

---

⑨ "N.J.Rev.Stat. § 18:25-17 (Supp. 1963) provides that if the Director finds that a respondent has violated the statute, he shall issue an order, 'requiring such respondent to cease and desist from such unlawful employment practice or unlawful discrimination and to take such affirmative action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, or restoration to membership, in any respondent labor organization, or extending full and equal accommodations, advantages, facilities, and privileges to all persons, as, in the judgment of the director, will effectuate the purpose of this act. . . .' "

requiring administrative determination of liability of a relative for old-age assistance. In doing so, the court commented that:

> "* * * [T]he mere fact that some functions usually performed by courts are conferred upon an administrative body does not necessarily bring the legislation into conflict with the principle of the separation of powers * * *." 206 Or at 698.
> "Delegation to agencies of power to adjudicate is commonplace, but most such delegation involves new functions of government * * *." Davis, Administrative Law Text 46 (1959).

The protection of the individual from the effects of racial discrimination is a new function of government.

An award of compensation by an administrative body for damages suffered as an effect of racial discrimination does not violate Amended Art VII, § 3, Oregon Constitution, which states that "In actions at law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved * * *."

In *Cornelison v. Seabold*, 254 Or 401, 460 P2d 1009 (1969), an injured workman brought an action against third parties for injuries arising out of his employment. The third parties filed supplemental answers alleging that the workman's sole remedy was that provided by the Workmen's Compensation Act. The trial court agreed and the workman appealed. He claimed that the trial court erred by not permitting a jury to try the issue raised by the supplemental answers, because Amended Art VII, § 3, Oregon Constitution, preserved the right to have the factual aspects of the issue tried by jury.

In affirming the trial court's action the Oregon Supreme Court said that Amended Art VII, § 3,

Oregon Constitution, assures trial by jury " '* * * in the classes of cases wherein the right was customary at the time the constitution was adopted,' * * * or 'cases of like nature,' * * *." 254 Or at 405.

"A commitment for mental incompetency does not require a jury trial because the statute at the time of the adoption of the Oregon Constitution did not so require. *In re Idleman's Commitment*, 146 Or 13, 28-30, 27 P2d 305 (1934). The issue of whether a relative is responsible for welfare payments made to another relative does not require a jury trial because such an issue had no common-law antecedent. *Mallatt v. Luihn*, 206 Or 678, 695, 294 P2d 871 (1956). The Oregon Constitution does not require that the issue of necessity in a private condemnation proceeding be tried before a jury because a jury did not try this issue at common law. *Moore Mill & Lbr. Co. v. Foster*, supra (216 Or at 219-231 [336 P2d 39, 337 P2d 810])." 254 Or at 405.

The court decided against the workman's contention that this was in essence an action for damages for personal injury which was triable by jury at common law.

"* * * The issue raised by the supplemental answer is whether or not plaintiff's sole remedy is compensation benefits awarded pursuant to the Workmen's Compensation Act. Workmen's compensation, of course, is a creation of the legislature, not of the common law. Thus, although the over-all proceeding is one known to common law the particular issue raised by the supplemental answers is not one known to the common law. Analytically, it would seem that it should be the nature of the particular issue in the proceeding, rather than that of the entire proceeding, which should dictate whether this issue is to be tried with or without a jury." 254 Or at 406.

We look to ORS ch 659 to determine what authority the legislature has conferred upon the Labor Commissioner. In construing the statute we follow the mandate of *State ex rel Nilsen v. Ore. Motor Ass'n*, 248 Or 133, 432 P2d 512 (1967), that:

"* * * [W]ords of common use are to be taken in their natural and obvious meaning and significance. That sense of the words is to be adopted which best harmonizes with the context and promotes the policy and objectives of the legislation * * *." 248 Or at 137.

See also *Blalock v. City of Portland et al*, 206 Or 74, 291 P2d 218 (1955); *Cary v. Metropolitan Ins. Co.*, 141 Or 388, 17 P2d 1111 (1933); *City of Portland v. Meyer*, 32 Or 368, 52 P 21, 67 AS 538 (1898).

ORS 659.010 provides in part:

"(2) 'Cease and desist order' means an order * * * issued to eliminate the effects of any unlawful practice found, addressed to a respondent requiring him to:

"(a) Perform an act * * * reasonably calculated to carry out the purposes of ORS 659.010 to 659.110, eliminate the effects of an unlawful practice found, and protect the rights of the complainant and others similarly situated * * *."

ORS 659.022 states the purposes of ORS 659.010 to ORS 659.110, some of which are to "insure human dignity" and to "protect [the victim's] health * * * from the consequences of intergroup hostility, tensions and practices of discrimination." It says that:

"* * * To accomplish this purpose the Legislative Assembly intends by ORS 659.010 to 659.110 to provide:

"* * * * * *

"(2) An adequate remedy for persons ag-

grieved by certain acts of discrimination because of race, religion, color, sex or national origin or unreasonable acts of discrimination in employment based upon age."

Racial discrimination of the type here practiced by the petitioners is made an unlawful practice in Oregon by ORS ch 659. Oregon courts recognize that mental suffering may be the direct, proximate and natural result of an infringement of a legal right. *Hinish v. Meier & Frank Co.*, 166 Or 482, 506, 113 P2d 438, 138 ALR 1 (1941). As shown above, other state courts have recognized mental anguish as one of the effects of racial discrimination. ORS 659.010 (2) gives the Commissioner of Labor the right to issue an order which requires an individual to perform an act reasonably calculated to carry out the purposes of ORS 659.010 to 659.110, one of which is to insure human dignity, and to eliminate the effects of an unlawful practice found. In construing the word "effect" we must give the word its obvious meaning. In the context of the statute, mental anguish, as well as pecuniary loss, can be an effect of racial discrimination. The award of damages to compensate for a victim's humiliation is an act reasonably calculated to eliminate the effects of the discrimination.

ORS 659.022 (2) clearly grants authority to the commissioner to effectuate the goals of ORS 659.010 (2) by providing an adequate remedy for persons aggrieved by the proscribed practices.

In *Antidiscrimination Laws in Action in New Jersey: A Law-Sociology Study,* 19 Rutgers L Rev 189, 242-43 (1965), Professor Blumrosen discussed the question presented here with regard to the New Jersey statutes:

"* * * The question which arises is whether

the Division on Civil Rights is empowered to award such damages [for humiliation and mental suffering]. The language of the statute would seem to permit such damages.[9] * * * The lack of a pecuniary standard by which to measure these damages might lead a court to hesitate before allowing administrative assessment of them. However, there is no logical reason to treat them as anything but actual compensation for actual harm * * * ."

We conclude that in the absence of any contention that the award for humiliation was excessive, the trial court erred in setting it aside.

We now consider the item of contingent moving expenses. After being told she could not rent the petitioners' apartment, and before the administrative proceedings took place, the complainant and her husband found another apartment and incurred expenses in moving into it. The commissioner ordered the petitioners to make the apartment in question, 712 N.E. 20th Avenue, available to the complainant and her husband, and awarded complainant $140 in moving costs "if complainant should accept tenancy." This award would have been appropriate if there had been satisfactory evidence of the estimated costs of making such a move. However, there was not. The sole real evidence was the complainant's testimony that

[9] "N.J.Rev.Stat. § 18:25-17 (Supp. 1963) provides that if the Director finds that a respondent has violated the statute, he shall issue an order, 'requiring such respondent to cease and desist from such unlawful employment practice or unlawful discrimination and to take such affirmative action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, or restoration to membership, in any respondent labor organization, or extending full and equal accommodations, advantages, facilities, and privileges to all persons, as, in the judgment of the director, will effectuate the purpose of this act. . . .' "

"movers" had given her estimates, the highest of which was $140. This evidence was objected to (albeit unartfully and technically perhaps not timely) as hearsay, which it was. The commissioner's own rule, OAR 839-14-005, Rule 8 (5)(b), provides:

> "Hearsay evidence shall not be admissible over an objection based on lack of opportunity to cross-examine."

Rules prescribing methods of procedure of an administrative board or commission have the effect of law, are binding on the board or commission and must be followed by it so long as they are in effect. *George v. Arizona Corporation Commission*, 83 Ariz 387, 322 P2d 369 (1958); *see also*, Cooper, 1 State Administrative Law 266 (1965).

For this reason the trial judge was correct in setting aside the award of contingent moving expenses.

## THE COMMISSIONER'S AUTHORITY TO REQUIRE REPORTS FROM A PERSON HE HAS FOUND TO HAVE VIOLATED THE PROVISIONS OF ORS 659.033

■ The circuit court set aside the provision of the Cease and Desist Order which required reports from petitioners regarding their rental properties.

The Cease and Desist Order provided:

> "* * * * *
>
> "(4) On or before December 29, 1967, and continuing through the month of December 29, 1969, the Respondents shall each month between the 1st and 15th thereof submit a written statement to the Bureau of Labor showing the number and nature of vacant rental properties owned by the Respond-

ents together with the price at which said rental property or properties can be rented, a statement of any notice the Respondents have received from existing tenants of an intention to move, the date the tenant intends to move, together with a statement of the terms and conditions under which the premises will be offered for rent.

"\* \* \* \* \*"

The judgment of the circuit court provided:

"\* \* \* \* \*

"(d) Paragraph (4) thereof is reversed as having no foundation in law.

"\* \* \* \* \*"

ORS 659.022 states the purpose of ORS 659.010 to 659.110 as being the protection of people from the consequences of discrimination, and provides:

"\* \* \* To accomplish this purpose the Legislative Assembly intends by ORS 659.010 to 659.110 to provide:

"\* \* \* \* \* \*

"(3) An adequate administrative machinery for the orderly resolution of complaints of discrimination through a procedure involving investigation, conference, conciliation and persuasion \* \* \*"

ORS 659.060 instructs the commissioner to issue an appropriate cease and desist order against any person found to have engaged in any unlawful practice charged.

ORS 659.010 (2) defines a cease and desist order as being an order:

"\* \* \* [T]aking into account the subject matter of the complaint and the need to supervise compliance with the terms of any specific order issued to eliminate the effects of any unlawful

practice found, addressed to a respondent requiring him to:

"\* \* \* \* \*

"(b) Take such action and *submit such designated reports* to the commissioner on the manner of compliance with other terms and conditions specified in his order as may be required to assume compliance therewith \* \* \*." (Emphasis supplied.)

ORS 659.010 (2)(a) requires the commissioner in his cease and desist order to act to "protect the rights of the complainant and other persons similarly situated." The petitioners had discriminated and had resisted conciliation and persuasion. The commissioner was entitled to conclude that such discriminatory conduct might continue in the future were other Negroes to apply for occupancy in the future. The statutory authorization to require reports from the petitioners provides a mechanism by which to protect the rights of other persons situated similarly to the complainant.

■ The petitioners argue that regardless of whether or not the commissioner has the power to require them to make reports, the question has now become moot because the four housing units, 702-708 and 712-718 N.E. 20th Avenue, were the only rental units in which the petitioners had any interest, and this property was sold prior to the time of the decision on appeal by the circuit court.

The fact that the petitioners may have sold the property is irrelevant. The cease and desist order required reports on any rental property they now own or might own during the period covered by the order. It did not refer to the specific rental property at which the discriminatory action took place.

The provisions of ORS 659.010 (2)(b) are very similar to those of 29 USC § 160 of the National Labor Relations Act. Federal courts have upheld report-making orders under this section on the ground that selection of remedies is a matter for administrative competence so long as the order is related to the effectuation of the purposes of the Act and is not oppressive. *Local 138, International Union of Operating Engineers v. N.L.R.B.*, 321 F2d 130, 137-38 (2d Cir 1963); *N.L.R.B. v. General Drivers, Chauffeurs & Helpers, etc.*, 264 F2d 21, 23 (10th Cir 1959).

Mrs. Joyce argues that the two-year reporting period was excessive, pointing out that in *Kindt v. State Commission for Human Rights*, 23 App Div2d 809, 258 NYS2d 250, aff'd 16 NY2d 1001, 265 NYS2d 662, 212 NE2d 898 (1965), the reporting period required was for one year only. We note that in the *Kindt* case the reporting requirements were much more detailed than here. We cannot say a two-year requirement was an abuse of discretion. It follows that the trial court erred in setting aside the reporting requirement of the commissioner's order.

## THE CONSTITUTIONALITY OF ORS 659.031

ORS 659.033 (1) provides that "No person engaged in the business of selling real property shall" discriminate.

ORS 659.031 (1) defines " 'Person engaged in the business of selling real property' * * *" as including:

"(a) A person who, as a business enterprise, sells, leases or rents real property.

"(b) A person who sells, leases or rents real property in connection with or as an incident to his business enterprise."

Mrs. Joyce argues:

> "If the legislature intended that any person selling or renting real property should be covered by the terms of ORS 659.033, it would have so stated. However, the legislature goes on to define a 'person engaged in the business of selling real property,' as one who does so as a business enterprise, or as an incident to a business enterprise. The legislature did not see fit to define the terms 'business enterprise,' and the statute thereupon becomes vague and uncertain."

 She admitted that the property was operated with a profit motive, although she contended that the net income was relatively small. ORS 659.031 does not distinguish between big business and little business. There is nothing in the statute that says the renting of real property is a business only if it is the primary source of the owner's income. There is nothing in ORS ch 659 to indicate that the protection to minority groups afforded by it is only to those who choose to live in complexes so large that they are the owner's primary source of income. We construe "business enterprise" for the purpose of this statute as it is defined in Black's Law Dictionary (4th ed 1951):

> "Investment of capital, labor and management * * * for profit * * *."

We construe the use of the words "business" and "business enterprise" as meaning to exclude from the ambit of the Act those persons dealing in or with real property for reasons other than profit. If the property in question was being operated solely for the benefit of Mrs. Forken and without any profit motive or practices which were intended to produce profit, the result might be different, but we are not here faced with that question. The fact that Mrs.

Joyce, as she testified was her intention, may have devoted her income from the premises in question to the care and well-being of her mother, does not make the enterprise an eleemosynary one. The trial court properly ruled that Mrs. Joyce's operation of 712 N.E. 20th Avenue clearly was within the purview of ORS ch 659.

It is also argued that the Oregon Civil Rights Act is now void because it has been pre-empted by the Federal Fair Housing Act. To the contrary, the latter Act expressly does not pre-empt consistent state legislation. 42 USC § 3615.

Affirmed in part; reversed in part.