SANDRA ZAHORIAN, COMPLAINANT, v. RUSSELL FITT REAL ESTATE AGENCY, RUSSELL A. FITT AND MARION J. FANNING, RESPONDENTS-CROSS-APPELLANTS, AND NEW JERSEY DIVISION ON CIVIL RIGHTS, APPELLANT-CROSS-RESPONDENT.

Argued November 20, 1972—Reargued March 6, 1973—
Decided March 19, 1973.

400

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for the appellant-cross-respondent New Jersey Division On Civil Rights (*Mr. George F. Kugler, Jr.,* Attorney General, attorney; *Mr. David Ben-Asher,* Deputy Attorney General, on the brief).

*Mr. Harold J. Brown* argued the cause for the respondents-cross-appellants Russell Fitt Real Estate Agency, Russell A. Fitt and Marion J. Fanning (*Messrs. Joyce & Brown,* attorneys).

*Mr. Peter A. Buchsbaum* filed a brief for *Amici Curiae* — American Civil Liberties Union of New Jersey, NAACP, New Jersey State Conference of NAACP Branches, Urban League of Essex County, National Organization for Women, Essex, Middlesex, Monmouth and Northern New Jersey chapters, Women's Equity Action League and The American Jewish Congress.

The opinion of the Court was delivered by

JACOBS, J. The Appellate Division, in an unreported *per curiam,* affirmed the Division on Civil Rights' finding of discrimination but modified the relief which it had directed. The Division on Civil Rights petitioned and the respondents cross-petitioned for certification. We granted both petitions. 60 *N. J.* 355 (1972).

The complainant Sandra Zahorian filed a verified complaint with the Division on Civil Rights, charging that the respondents had denied her the opportunity of renting a listed apartment solely because of her sex and marital status, in violation of *N. J. S. A.* 10:5–12(h). The Director of the Division found probable cause and designated Mrs. Sylvia Pressler, a Hearing Examiner selected from an existing panel, to conduct a hearing of the complaint. In due course she took the testimony of the complainant and her supporting witnesses, along with the testimony of the respondent Mrs. Fanning who was the only witness on behalf of herself and the other respondents. The complainant's testimony was fully credited by the Examiner and it may fairly be summarized as follows:

She was 24 years old, unmarried, and employed as a computer programmer analyst in Clifton. She had been living with her parents but wished to obtain an apartment for herself and her female friend who was also unmarried and employed and was 27 years old. They planned to share a two-bedroom apartment, preferably in Montclair, and in September 1970 the complainant began her search for an apartment. She first obtained the name of the respondent Russell Fitt Real Estate Agency from the telephone book's yellow pages and thereafter she spoke with the respondent Marion J. Fanning who was employed by the Agency and was its apartment specialist. During her first telephone conversation she learned that Mrs. Fanning had at least two listed two-bedroom apartments, one over a store at a rental of $135 per month and one in a garden apartment complex at a rental of approximately $200 per month. But Mrs. Fanning told her that the owners would not rent these apartments to single girls. Mrs. Fanning would not show the apartments to her nor would she give her the names or addresses of the owners or the apartment superintendents. In all, the complainant had four telephone conversations with Mrs. Fanning and the substance of each conversation

was the same, namely, since she was a young, unmarried female the apartments were not available to her.

Mrs. Fanning testified that she never spoke with the complainant over the telephone but that she did speak to her personally on a single occasion. She said that she told the complainant about the apartments and that she would be happy to show them to her although the owners were not inclined to rent to two young, unmarried women. She said that the complainant declined her offer to be shown the apartments. The Examiner, pointing to the irreconcilable differences between the testimony of the complainant and Mrs. Fanning, noted that she was impressed "with the testimonial candor and sincerity" of the complainant and that she found Mrs. Fanning's description of her conversation with the complainant to be "inherently incredible." She made the finding that "despite the fact that respondent Agency had listings of two available apartments within complainant's price range, which were suitable for occupancy by two single young women, complainant was denied the opportunity to view and to rent these apartments by respondent Fanning because she is young, female and unmarried and wished to share the apartment with a friend simliarly situated."

Mr. Blanos, a field representative who was employed by the Divison on Civil Rights and was twenty-three years old and single, testified that he spoke with Mrs. Fanning over the telephone and told her he was a salesman and was looking for a two-bedroom apartment for himself and another young male friend. She told him that one-, two- and three-bedroom apartments were available and that she would be happy to have him check with her later that day. The Examiner contrasted the treatment of Mr. Blanos with the treatment of the complainant and concluded that while "unrelated male roommates were not regarded either by respondents or their principals as prima facie objectionable tenants, female roommates were." Mrs. Levy, a field representative employed by the Division on Civil Rights, testified

that she served a copy of the verified complaint in the instant matter on the respondent Russell A. Fitt at the Fitt Agency. Mr. Fitt read the complaint and said "What shall I do? When we place single people in an apartment we get into trouble. I think she was just looking for trouble. She really didn't want that apartment." The Examiner referred to this testimony, and to the fact that Mr. Fitt did not testify though he was present during the hearing, in support of her finding that "respondent Fitt had knowledge of, participated and concurred in the acts of Mrs. Fanning and is equally responsible with her for them."

The complainant testified that Mrs. Fanning's discriminatory treatment of her humiliated her and caused her actual physical and emotional disturbance. She stated that during the period covered by her telephone conversations with Mrs. Fanning she was so upset and suffered such stomach distress that she was obliged to consult her physician on several occasions. Her mother Mrs. Helen Zahorian testified that when the complainant came home after conversations with Mrs. Fanning she was very upset, would not eat and complained about headaches. The complainant told her mother that she understood she could not have the apartment because she was single and that she "felt that this was such an awful thing to happen to her and to think because she wasn't married she couldn't have an apartment." Mrs. Zahorian accompanied her daughter on her visits to her physician who told her that "it was all nerves and he wasn't going to put her through any procedure of series of tests until he could determine that this wasn't just nerves." Ultimately when the complainant abandoned her efforts to obtain a Montclair apartment for herself and her friend and settled on a one-bedroom apartment for herself which she obtained in Paterson, her physical and emotional distress apparently terminated; her mother testified that since she obtained her apartment "she has been fine."

During the hearing before the Examiner the respondents contended that the discrimination was not directed against the complainant because she was female and unmarried but was against the combination of the complainant and her friend and they urge that while the law admittedly prohibits a landlord from refusing to rent an apartment to an applicant because she is female and unmarried, it does not prohibit a landlord from refusing to rent an apartment to two young women who are unmarried. The Examiner found that there was discrimination against the complainant grounded on her sex and marital status and that "the apartment would have been withheld from complainant even if she had been willing to rent it for her exclusive use." In addition, the Examiner expressed the view, with which we agree, that the statutory provision, as last amended in 1970 (*N. J. S. A.* 10:5–12(h)(1)), prohibiting a real estate broker or its employee from refusing a rental to any "person or group of persons" because of "marital status or sex" clearly negates the respondents' contention. As the Examiner put it: "There can be no question but that the 1970 Amendment of the Law Against Discrimination intended, *inter alia,* to insure the rights of two persons of the same sex who constituted themselves into a housekeeping unit and furthermore, that such an arrangement is entirely unexceptional. It is common practice for young unmarried working girls to make that kind of living arrangement." See *Gabe Collins Realty, Inc. v. City of Margate City,* 112 *N. J. Super.* 341, 349 (*App. Div.* 1970); *cf. Kirsch Holding Co. v. Borough of Manasquan,* 59 *N. J.* 241 (1971).

After finding that an act of discrimination in violation of *N. J. S. A.* 10:5–12(h)(1) had been committed by respondent Mrs. Fanning, that respondent Russell A. Fitt by his concurrence in Mrs. Fanning's action was equally responsible, and that pursuant to the doctrine of *respondeat superior* the corporate respondent Russell Fitt Real Estate Agency was also responsible (*cf. Jones v. Haridor Realty Corp.,* 37 *N. J.* 384, 395–396 (1962); *Jackson v. Concord*

*Company,* 54 *N. J.* 113, 125 (1969) ), the Examiner proceeded with findings as to damages. She compared the $135 per month two-bedroom Montclair apartment which had been denied to the complainant with the $150 per month one-bedroom Paterson apartment which she ultimately obtained and concluded that, apart from the extra bedroom, they were comparable in size, facilities and accommodations. She determined that the fair market value of the Montclair apartment was $150 per month and that the complainant was entitled to damages for "loss of her bargain" which amounted to $180 for the requested one-year lease of the Montclair apartment. Though the complainant suggested that her damages in this connection should have been fixed in a greater sum, that point has not been pursued and is not now before us.

The Examiner found that, in addition to the aforementioned $180, the complainant should receive a compensatory sum for the humiliation and pain and suffering caused to her. She cited *Gray v. Serruto Builders, Inc.,* 110 *N. J. Super.* 297 (*Ch. Div.* 1970), as an instance where, though there were no aggravating circumstances, the sum of $500 was awarded to a plaintiff as compensatory damages for humiliation suffered by him as a result of racial discrimination and she recommended to the Director of the Division on Civil Rights that an award to the complainant Sandra Zahorian in the sum of $750 would be appropriate "in view of the nature of her response to the insult as well as the nature of the insult itself." The Director, in his Findings, Determination and Order, approved the Examiner's findings on discrimination and directed that the complainant be paid the sum of $180 for "economic loss" and the sum of $750 for "actual pain and suffering" caused to the complainant by the respondents' discriminatory action. In addition, the Director ordered, *inter alia,* that respondents cease and desist from discriminatory actions, submit to the Division a list of vacancies every thirty days for two years, advise the Division of the names, addresses, ages, sex and marital status

of prospective applicants for rentals every thirty days for two years, and post a copy of the order and written instructions for compliance for a period of two years.

On the respondents' appeal to the Appellate Division that court found that the record supports the Division's finding of discriminatory action by respondents against complainant because of her sex and marital status. It also found that the complainant was properly awarded the sum of $180 for economic loss. However, it determined that the Division had no jurisdiction to make any award to the complainant for pain and suffering and accordingly it vacated the Division's $750 award to her. In addition, the Appellate Division set aside the Director's order that the respondents advise the Division as to the identities of prospective applicants and also set aside the Director's order for posting and the submission of lists of vacancies. In granting certification our concern was not with further review of the factual findings on discrimination; in any event, we have examined the record, are satisfied that the factual findings were adequately supported by the testimony, and shall therefore not disturb them. See *Clover Hill Swimming Club v. Goldsboro,* 47 *N. J.* 25, 36 (1966)*; Robinson v. Branch Brook Manor Apartments, et al.,* 101 *N. J. Super.* 117, 122 *(App. Div.), certif. denied,* 52 *N. J.* 487 (1968). Our concern related primarily to the scope of the Division's power to award compensatory damages and additionally to the Appellate Division's action in nullifying portions of the other relief which the Division had granted in the exercise of its jurisdiction as it understood it. See *N. J. S. A.* 10: 5–6; *N. J. S. A.* 10:5–17; *Jackson v. Concord Company, supra,* 54 *N. J.* 113; *Polk v. Cherry Hill Apartments, Inc.,* 62 *N. J.* 55 (1972); *Robinson v. Branch Brook Manor Apartments, et al., supra,* 101 *N. J. Super.* 117.

Preliminarily, we wish to comment on the attack which the respondents made during oral argument on the nature of the hearing before the Division. They seemingly urged that the concentration of functions (*N. J. S. A.* 10:

5–1 *et seq.; In re Larsen,* 17 *N. J. Super.* 564 *(App. Div.* 1952) ; *In re Blum,* 109 *N. J. Super.* 125 *(App. Div.* 1970)) and the admission of hearsay testimony *(N. J. S. A.* 10: 5–16; *Mazza v. Cavicchia,* 15 *N. J.* 498, 509 (1954)) rendered the proceedings fundamentally unfair. But study of the record has convinced us that the hearing was conducted fairly and well within controlling legal principles. See *David v. Vesta Co.,* 45 *N. J.* 301, 323–328 (1965). Acting under express statutory direction the Attorney General appointed, with the approval of the Commission on Civil Rights, a panel of Hearing Examiners composed of persons licensed to practice law for at least five years. *N. J. S. A.* 10 :5–8(*l*). While such panel may not match the ideal of the truly "independent corps of hearers" referred to in the dissent to *Mazza v. Cavicchia, supra,* 15 *N. J.* at 536, it appears to insure a measure of independent fact-finding beyond that generally available in other New Jersey administrative agencies. See *In re Larsen, supra,* 17 *N. J. Super.* 564; *cf. Davis, Administrative Law Treatise* § 13.02, *p.* 175 (1958), 1970 *Supp. Vol. p.* 457; Aronsohn, "The Need for a Corps of Independent Hearing Examiners in State Administrative Agencies," 96 *N. J. L. J.* 80 (Jan. 18, 1973). We find no basis for the respondents' criticism of the Examiner and her rulings during the hearing. Her receipt of the complainant's testimony with respect to her telephone conversations with Mrs. Fanning was clearly proper even under strict evidential principles *(cf. Robinson v. Branch Brook Manor Apartments, et al., supra,* 101 *N. J. Super.* at 121; *McCormick, Evidence p.* 554 (2d 1972)), and her receipt of the corroborative testimony by the complainant's mother with respect to the complainant's upsets and visits to her physician was also proper, surely for the purposes tendered in the administrative hearing below. See *N. J. S. A.* 10 :5–16; *Mazza v. Cavicchia, supra,* 15 *N. J.* at 509.

We come now to the provisions in the Director's order which were nullified by the Appellate Division. The order required that respondents submit to the Division, every

thirty days for two years, lists of vacancies and records of applicants and post a copy of the order and written instructions for compliance for a period of two years. The Appellate Division, without any discussion whatever, struck these requirements, simply describing the requirement relating to applicants as "improper" and the other requirements as "unnecessary." In *Jackson v. Concord Company, supra,* 54 *N. J.* 113, we upheld a requirement that records relating to vacancies and rentals be maintained and made available to the Division for inspection. In *Polk v. Cherry Hill Apartments, Inc., supra,* 62 *N. J.* 55, we sustained a direction that the landlord furnish, every thirty days for two years, a current list of apartments available for rental. And in *Robinson v. Branch Brook Manor Apartments, et al., supra,* 101 *N. J. Super.* 117, the Appellate Division sustained a direction that discriminatory practices be terminated, that instructions be circulated to employees to comply with the Division's order, and that a copy of the order be suitably posted.

The statute vests the Director with remedial powers which have been broadly expressed legislatively (*N. J. S. A.* 10:5–6; *N. J. S. A.* 10:5–17) and have been broadly applied judicially. *Jackson v. Concord Company, supra,* 54 *N. J.* 113. Here the respondents denied that they had engaged in discriminatory conduct violative of the recent amendments which related to sex and marital status discrimination (*L.* 1970, *c.* 80) and respondent Fanning placed her denial under oath. But the evidence adequately supported the Division's finding that there had been such conduct and the remedial steps which would be required to terminate it and to insure future compliance were matters largely within the Director's discretion. He had before him not only the transcript in the instant matter but also the record of an earlier consent order against the respondents Fanning and Fitt in a matter involving unlawful discrimination. His conscientious determination that the requirements for posting and the submission of lists of vacancies and records of applicants were necessary and appropriate should not be interfered with ju-

dicially in the absence of a showing of illegality, arbitrariness or the like; here there was no such showing and accordingly the Appellate Division should not have stricken his requirements. See *Jackson v. Concord Company, supra*, 54 *N. J.* 113; *Polk v. Cherry Hill Apartments, Inc., supra*, 62 *N. J.* 55; *Robinson v. Branch Brook Manor Apartments, et al., supra*, 101 *N. J. Super.* 117; *cf. N. J. Builders, Owners and Managers Association v. Blair*, 60 *N. J.* 330 (1972).

Finally we turn to the question of whether the Director had authority to award, as he did, not only the sum of $180 for economic loss but also compensatory damages in the sum of $750 for the pain and suffering to which the complainant had been subjected. *Jackson v. Concord Company, supra*, 54 *N. J.* 113 sustained the Director's jurisdiction to award compensatory damages for the economic loss suffered by the person discriminated against; this holding furnishes ample support for the $180 award and accordingly that item presents no further problem. However, the Appellate Division stated that it did not understand *Jackson* "to mean that the Division can make a general award of damages such as here for 'pain and suffering'." It went on to suggest that if the Division were permitted to allow minor awards for pain and suffering, the next step would be to award substantial amounts for "serious and permanent physical or mental disability as the result of the discrimination." It expressed the view that "such matters are better reserved to traditional court proceedings"; on that stated ground without more it struck the Division's $750 award to the complainant.

The Division on Civil Rights was created by the Legislature with express power in *N. J. S. A.* 10:5-6 "to prevent and eliminate" and "to take other actions" against unlawful discrimination. Prior to 1970 the discrimination referred to related to "race, creed, color, national origin, ancestry or age"; since the enactment of *L.* 1970, *c.* 80, effective June 2, 1970, the discrimination referred to includes "marital status or sex." We reject the respondents' sugges-

tion that the omission of the words "marital status or sex" in connection with the words "other actions" was deliberate; the history of *L.* 1970, *c.* 80 and the sweeping extent of its amendatory references to "marital status or sex" satisfy us that the omission was inadvertent and may properly be supplied by judicial construction. See *Iadone v. State,* 1 *N. J. Misc.* 281, 283–284 (Sup. Ct. 1923). Furthermore, the more crucial statutory language is found in *N. J. S. A.* 10:5–17 which admittedly applies to all findings of discrimination including sex and marital status discrimination; that section provides in pertinent part that where the Director finds unlawful discrimination he shall issue a cease and desist order and "take such affirmative action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, . . . as, in the judgment of the director, will effectuate the purpose" of the statute.

In *Jackson v. Concord Company,* 101 *N. J. Super.* 126 (*App. Div.* 1968), the Appellate Division held that the aforequoted language in *N. J. S. A.* 10:5–17, even when read in the context of the goals of the Law Against Discrimination (*N. J. S. A.* 10:5–1 *et seq.*), was insufficient to authorize the Division to grant compensatory damages for loss suffered by the complainant as a result of the unlawful discrimination against him. On appeal, we reversed and sustained the Director's award of a sum representing the complainant's out-of-pocket loss. In the course of his opinion for all of the participating members of the Court, Justice Hall noted that the basic question was whether the Legislature intended to give such power to the Director and that although it was not granted expressly by *N. J. S. A.* 10:5–17 it was fairly to be implied in the light of the "broad language of the section" and the "overall design of the act." 54 *N. J.* at 126. See *N. J. Builders, Owners and Managers Association v. Blair, supra,* 60 *N. J.* 330, 338–340; *cf. J. C. Chap. Prop. Owner's, &c., Assoc. v. City Council,* 55 *N. J.* 86, 100 (1969); *State v. New Jersey National Bank and Trust Co.,* 62 *N. J.* 50, 54 (1972). He noted

further that the term "include" is to be dealt with as a word of "enlargement and not of limitation" and that this was especially true where as in *N. J. S. A.* 10:5–17, it was followed by the phrase "but not limited to" the illustrations given. 54 *N. J.* at 126–127. See *Fraser v. Robin Dee Day Camp,* 44 *N. J.* 480, 485–486 (1965).

Justice Hall's opinion in *Jackson* (54 *N. J.* 113) stressed the legislative intent to create an effective enforcement agency which would serve towards eradication of "the cancer of discrimination" and whose remedial actions would serve not only the interest of the individual involved but also the public interest. 54 *N. J.* at 124–125; see *Robinson v. Branch Brook Manor Apartments, et al., supra,* 101 *N. J. Super.* at 124. He pointed out that there was no constitutional objection to legislative authorization of money damages as "incidental relief" to administrative cease and desist orders (54 *N. J.* at 126) and that the view that here there was such legislative authorization finds support not only from the breadth of the terms in *N. J. S. A.* 10:5–17 but also from other sections of the statute such as *N. J. S. A.* 10:5–27. That section provides that the administrative proceeding shall be exclusive while it is pending and that the final administrative determination shall exclude "any other action, civil or criminal, based on the same grievance of the individual concerned." Thus it appeared that the complainant in *Jackson* would be barred from recompense elsewhere and the Court suggested that it might fairly be inferred from this that the Legislature understood that "the Director had the power to award such recompense." 54 *N. J.* at 128.

Although the approach in *Jackson* (54 *N. J.* 113) points most forcefully towards recognition of the Director's authority to make an incidental award for pain and suffering, such as that allowed here, the respondents urge that *Jackson* should now be strictly confined to its own facts, namely, an award for economic loss. They advance no significant argument in support other than that summarily suggested by

the Appellate Division, to wit, that the recognition of authority to grant minor or incidental pain and suffering awards may ultimately lead to substantial claims for "serious and permanent physical or mental disability" which would entail extensive adversary litigation "better reserved to traditional court proceedings." But it would seem entirely evident that the recognition of administrative authority to make minor or incidental awards need not carry with it any authority to entertain a matter where, because of the severity of the consequential injury and the extensiveness of the claim, the item of damages has become primary and the other relief incidental rather than the reverse. Surely there is nothing incompatible in concluding that while the Legislature contemplated that the Director would have authority to award compensatory damages for pain and suffering as well as economic loss, his authority would be confined to an award which truly constituted only "incidental relief" (*Jackson, supra,* 54 *N. J.* at 126) rather than a primary item.*

In furtherance of the high-minded statutory goals, courts in other states have forthrightly sustained incidental awards for humiliation and pain and suffering without encountering the spectre envisioned by the Appellate Division. See 8 *Willamette L. J.* 102 (1972); 35 *Albany L. Rev.* 782 (1971); 49 *N. C. L. Rev.* 221 (1970). Thus New York's statute (*N. Y. Executive Law* § 297(4)(c)(ii) (*McKin-*

---

*The lines between incidental and nonincidental should present no serious difficulties. The law is thoroughly accustomed to similar lines as, *e. g.*, between reasonable and unreasonable (*Prosser, Torts, p.* 145 *et seq.* (*4th ed.* 1971)), between substantial and insubstantial (3A *Corbin, Contracts* § 704, *p.* 318 (1960)), and between "the important and the trivial" (Cardozo, J. in *Jacob & Youngs v. Kent,* 230 *N. Y.* 239, 129 *N. E.* 889, 891 (1921)). As Holmes so often pointed out, in law as in life, differences are generally differences of degree, and lines must be drawn somewhere. See *Panhandle Oil Co. v. Mississippi,* 277 *U. S.* 218, 223, 48 S. Ct. 451, 72 *L. Ed.* 857, 859 (1928); *Keller v. United States,* 213 *U. S.* 138, 149, 29 S. Ct. 470, 53 *L. Ed.* 737, 741 (1909); *Lerner, The Mind and Faith of Justice Holmes* 260 (1943).

*ey's Consol. Laws, c.* 18, 1972)) which authorizes the Commissioner of the Division of Human Rights to award compensatory damages to persons aggrieved by unlawful discriminatory conduct has been applied to allow not only awards for economic loss but also awards for incidental humiliation, pain and suffering. In *State Commission for Human Rights v. Speer,* 35 *A. D. 2d* 107, 313 *N. Y. S. 2d* 28 (1970), *rev'd,* 29 *N. Y. 2d* 555, 324 *N. Y. S. 2d* 297, 272 *N. E. 2d* 884 (1971), the Commissioner awarded $500 "as compensatory damages to complainant John E. Gaynus for the pain and suffering he had endured as a result of the respondents' discrimination in connection with the rental of premises." In the Appellate Division a divided court held that while the Commissioner could allow out-of-pocket expenses he could not award damages for mental anguish or injury but the Court of Appeals summarily reversed and remanded the matter for a determination as to whether "the award for damages was justified by the evidence." 29 *N. Y. 2d* 555, 324 *N. Y. S. 2d* 297, 272 *N. E. 2d* 884. See *State Division of Human Rights v. Luppino,* 29 *N. Y. 2d* 558, 324 *N. Y. S. 2d* 298, 272 *N. E. 2d* 885 (1971) ; see also *Italiano v. New York State Ex. Dept., Div. of H. Rts.,* 36 *A. D. 2d* 1009, 321 *N. Y. S. 2d* 422 (1971) and *New York City Commission on Human Rights v. Knox Realty Corp.,* 56 *Misc. 2d* 806, 290 *N. Y. S. 2d* 633 (Sup. Ct. 1968), where incidental awards of $250 and $100 respectively for humiliation, pain and suffering were upheld; *cf. Chance v. Frank's Beauty Salon,* 35 *A. D. 2d* 304, 316 *N. Y. S. 2d* 236 (1970) ; *State Division of Human Rights v. McGinnis,* 37 *A. D. 2d* 759, 322 *N. Y. S. 2d* 822 (1971).

In *Massachusetts Commission Against Discrimination v. Franzaroli,* 357 *Mass.* 112, 256 *N. E. 2d* 311 (1970), the court dealt with a statutory provision which empowered the Commission to award damages not exceeding $1,000, which damages could include but were not limited to the expenses incurred by the complainant "for obtaining alternative housing or space, for storage of goods and effects, for moving and

for other costs actually incurred by him." The Commission granted an incidental award of $250 for the mental distress resulting from the "considerable frustration, anger and humiliation" caused the complainant. In sustaining the award the court held that, although the illustrations in the statute related to economic loss, the Commission was not confined to awards for such loss but could allow incidental awards for mental suffering, pointing out that in appropriate cases the Massachusetts courts themselves had comparably allowed damages for mental suffering resulting from wrongful conduct. See *Lombard v. Lennox,* 155 *Mass.* 70, 28 *N. E.* 1125 (1891); *cf. Gray v. Serruto Builders, Inc., supra,* 110 *N. J. Super.* at 312–318; *Annot.,* 40 *A. L. R. 3d* 1290 (1971).

In *Williams v. Joyce,* 4 *Ore. App.* 482, 479 *P. 2d* 513 (1971), the court dealt with an antidiscrimination statute which, like New Jersey's statute, contained broad general provisions but no specific references to money damages as such. The complainant had been discriminated against and the Commissioner's cease and desist order contained an incidental award of $200 to the complainant for the "humiliation, frustration, anxiety and nervousness" suffered by her. The trial court held that the Commissioner had no authority to make the award but this holding was set aside by the Court of Appeals in an opinion which made note of *Jackson v. Concord Company, supra,* 54 *N. J.* 113, along with Professor Blumrosen's article in which he had, prior to *Jackson,* expressed the view that the broad general terms of New Jersey's statute would seem to permit the administrative allowance of incidental damages for "humiliation and mental suffering." Blumrosen, "Anti-Discrimination Laws in Action in New Jersey: A Law-Sociology Study," 19 *Rutgers L. Rev.* 187, 242–43 (1965). The opinion also noted that the Oregon statute authorized the Commissioner to direct the performance of acts reasonably calculated to carry out the statutory purposes which included the preservation of human dignity and the elimination of the effects of unlawful discrimination. It concluded that, in the statutory

context, mental anguish as well as pecuniary loss could be the effect of discrimination and that the award of damages to compensate for a victim's humiliation could readily be viewed as "an act reasonably calculated to eliminate the effects of the discrimination." *Cf. N. J. S. A.* 10:5–6; *N. J. S. A.* 10:5–17.

■ In the light of all of the foregoing we have no hesitancy in determining that the Director acted fairly within the orbit of the legislative delegation to him when he awarded $750 to the complainant as incidental compensatory damages for the pain and suffering inflicted on her. There was ample evidence to establish causation and while the amount allowed might well have been fixed in a lesser sum we are not, in the light of current values, prepared to say that it was so unreasonably high as to call for its reduction at our appellate level. See *Nusser v. United Parcel Service of New York, Inc.,* 3 *N. J. Super.* 64, 68–70 *(App. Div.* 1949); *Andryishyn v. Ballinger,* 61 *N. J. Super.* 386, 393 *(App. Div.), certif. denied,* 33 *N. J.* 120 (1960); *Hacker v. Statman,* 105 *N. J. Super.* 385, 395–396 *(App. Div.), certif. denied,* 54 *N. J.* 245 (1969); *cf. N. J. S. A* 10:1–6; *Gray v. Serruto Builders, Inc., supra,* 110 *N. J. Super.* 297. We find that the Director's order was in all respects within his authority and was supported by the evidence. The Appellate Division should not have altered it but should have sustained it in full; to that end its judgment is hereby:

Modified, with direction that the Director's order be reinstated.

HALL, J. (dissenting in part). I am in disagreement with that portion of the majority opinion which finds power in the Director of the Division on Civil Rights to make, in connection with the granting of specific relief and recompense of economic loss, "minor or incidental" awards of money damages to complainants for "humiliation" and "pain and suffering" (which I will refer to generally as damages

for mental distress) caused by acts of discrimination. The majority finds, however, no legislative authorization to make such awards when the claimed consequential injury is severe and extensive.[1]

The power of the Division to award damages is purely a question of legislative intent, here necessarily to be divined largely from the statutory language. In my view, an intent to authorize agency award of damages for mental distress in any amount — an important public policy matter[2] — is so extremely doubtful that I am convinced the power should be denied unless and until the Legislature bestows it in plain and unmistakable terms. *Burlington County Evergreen Park Mental Hospital v. Cooper*, 56 *N. J.* 579, 599 (1970).

It must constantly be kept in mind that the Law Against Discrimination, *N. J. S. A.* 10:5-1 *et seq.*, and particularly, the remedy section, *N. J. S. A.* 10:5-17, is designed to effectuate, by expeditious administrative action, speedy, spe-

---

[1] It may be noted that the practicalities arising from a classification of power to make small awards, but not big ones, are so serious that one can properly feel the Legislature could not possibly have intended any such distinction. Apart from the matter of the figure at which the line is to be drawn, as to which the majority is silent, they must mean that, when there is a large claim for consequential personal damages, the aggrieved party has to bring a plenary suit in the courts for all the relief sought, at his own expense. *See Gray v. Serruto Builders, Inc.*, 110 *N. J. Super.* 297 (Ch. Div. 1970). He will have to give up his right to the statutory administrative proceeding, prosecuted for him by the Division, with its perhaps more important attendant advantage of obtaining speedy specific relief from the discriminatory action. And he will have to make in advance the choice of which road to travel because *N. J. S. A.* 10:5-27 specifies that the administrative procedure "shall, while pending be exclusive" and that "the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the individual concerned."

[2] It is not inappropriate to mention that the questions of when a legal cause of action for mental distress should arise at all, what damages should be allowed, and how they should be proved and fixed have plagued courts for years on end. *See Prosser, Torts* (4th ed. 1971) § 12.

cific relief to the individual complainant discriminated against and to prevent the discriminating party from engaging in such wrongful acts against others in the future. The agency is directed to investigate and prosecute proceedings on behalf of complainants to accomplish those objectives. The scheme is thus clearly not one to provide for a conventional law suit, with all its trappings and delays, before an administrative tribunal. Interpretation of the scope and extent of the remedy section must be reached in the light of these foundation principles. It calls for careful adherence in this regard to the limits imposed by the language of the legislation rather than a judicial effort to broaden the scope of the remedy section to convert the agency proceeding into a full fledged law suit — a result bound to happen as soon as pecuniary damages for mental distress are permitted.

The majority relies most heavily on language in *Jackson v. Concord Company,* 54 *N. J.* 113 (1969), which held that the statute sufficiently indicated a delegation of power to the Director to award damages for economic, out-of-pocket loss resulting from forbidden discriminatory acts. The question was whether the agency had authority to go beyond specific relief and make any monetary award at all. What I said in that opinion must be read and considered in that context. The matter of damages beyond those for economic loss was not involved, was specifically reserved, and the rationale of the opinion was not directed to it. 54 *N. J.* at 128.

The basis for the decision to allow awards for economic loss was found in clues from the language, particularly that used in the remedy section, *N. J. S. A.* 10 :5–17, which would have no purpose if recompense for economic loss was not intended. The analysis of these provisions is set forth at 54 *N. J.* at 126–128, and need not be here repeated. Suffice it now to say that the language of the section, to my belief, offers no clue that allowance of damages for mental suffering in any amount was at all intended.

Admittedly our Law Against Discrimination, as it presently exists, is a patchwork job and no model of clarity in

many respects. It started out in 1945 (*L. 1945, c.* 169) as a measure to prevent and eliminate practices of discrimination in employment because of race, creed, color, national origin or ancestry. It was patterned after a similar New York law, but has never contained the specific provision of that state's enactment (N. Y. Executive Law § 297(4)(c)) authorizing the "awarding of compensatory damages to the person aggrieved." This continued omission is most significant to me.

The remedy section (*L.* 1945, *c.* 169, § 16, p. 596), obviously originally derived from the National Labor Relations Act of some years before (now 29 *U. S. C. A.* § 160(c)), authorized in employment discrimination situations, as *N. J. S. A.* 10:5–17 still does today, cease and desist orders and "affirmative action, including, but not limited to, hiring, reinstatement or upgrading of employees, *with or without back pay,* or restoration to membership, in any respondent labor organization, . . . as, in the judgment of the commissioner, will effectuate the purposes of this act, and include a requirement for report of the manner of compliance." (Emphasis supplied). The italicized phrase was pointed to in *Jackson,* 54 *N. J.* at 127, as an indication of authority to recompense economic loss. Importantly, I believe, the United States Supreme Court has said that the similar language in the National Labor Relations Act did not empower the federal agency administering that statute to award recovery for consequential personal damages of victims of unfair labor practices. *International Union, United Automobile, Aircraft and Agricultural Implement Workers of America v. Russell,* 356 *U. S.* 634, 645–646, 78 *S. Ct.* 932, 2 *L. Ed. 2d* 1030, 1039 (1958).

As our statute was patched over the years by amendment to forbid other bases of discrimination and to cover places of public accommodation and housing as well as employment (*see Jackson,* 54 *N. J.* at 122, n. 3), parallel patching was done to various other sections of the law, including the remedy section, to include the expanded scope. But none of these changes gave any indication of intent to grant agency

power to award damages for other than economic loss. The last amendment to the remedy section (*L.* 1966, *c.* 17, § 7), quoted and referred to in *Jackson,* 54 *N. J.* at 127–128, amounts to only an effort to clarify the ascertainment of economic loss in non-employment situations.

The majority also relies on decisions in other states. I do not conceive of them as substantial authority in the light of our statutory language. New York, represented by *State Division of Human Rights v. Speer,* 29 *N. Y. 2d* 555, 324 *N. Y. S. 2d* 297, 272 *N. E. 2d* 884 (1971), rested its result on the previously referred to statutory language specifically empowering the award of "compensatory damages," which was construed to include all except punitive damages. The Massachusetts statute, which was involved in *Massachusetts Commission Against Discrimination v. Franzaroli,* 357 *Mass.* 112, 256 *N. E. 2d* 311 (1970), expressly authorized the award of damages in general terms up to a limit of $1,000. The result in Oregon, *Williams v. Joyce,* 4 *Or. App.* 482, 479 P. 2d 513 (1971), rests on reasoning no more persuasive to me than that of the majority here.

Since I find no power to award damages for mental distress, I do not reach the matter of the sufficiency of the proofs thereof in this case or the question of the excessiveness of the award.

I agree with the majority opinion on all other aspects of the case. I would, therefore, modify the judgment of the Appellate Division as that opinion directs except as to the award of damages for mental suffering.

Judge Lewis joins in this opinion.

CONFORD, P. J. A. D., Temporarily Assigned (dissenting in part). I join fully in the opinion of Justice Hall. I would, however, add another thought as to the unlikelihood of legislative intent by this statute to permit administrative recovery of damages for mental suffering, whether generally or to the limited extent allowed by the majority opinion. *N. J. S. A.* 10:5–27 reads, in part:

"* * * as to practices and acts declared unlawful by section 11 of this act, the procedure herein provided shall, while pending, be exclusive; and the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the individual concerned. Nothing herein contained shall bar, exclude, or otherwise affect any right or action, civil or criminal, which may exist independently of any right to redress against or specific relief from any unlawful employment practice or unlawful discrimination."

Reading the foregoing as an entirety, I construe it to mean that a victim of discrimination may seek relief for a particular remediable grievance in the agency or in the courts but if he takes judgment for that grievance in the agency he may not also seek relief for it in the courts. While the word "grievance" is susceptible of the meaning of the wrongful conduct of the offender, the context of its use here, the presence in the act of the last sentence quoted above and principles of presumptive reasonableness of legislative intent suggest that in this instance "grievance" means the particular injury complained of flowing from the wrongful conduct. Thus, discriminatory deprivation of an apartment rental is one grievance and mental distress consequent upon the refusal to rent is another.

However, it seems fair to say that the Legislature also contemplated by the provisions quoted above that an aggrieved person, if resorting to the agency for relief, should there seek whatever relief of any kind it has jurisdiction to award him, and that once he takes judgment in the agency he should be barred from recourse in the courts for any relief of the type he might have secured in the agency. But he would not be barred from going to both the agency and the courts if there were a type of relief available in the latter but not the former.

Under the formulation of the majority, agency relief is available for damages for mental distress but confined to "minor or incidental" recovery, presumably barring substan-

tial damage awards[1] even if no more than fairly compensatory for the humiliation and accompanying psychological or psychiatric injury caused. If my construction of *N. J. S. A.* 10:5–27 as outlined above is sound, the majority decision operates to condition availability of the vitally necessary and efficient administrative remedy for specific relief (award of rental of apartment, etc.) on the victim forfeiting any right to recovery in *any* tribunal of *substantial* damages for mental suffering consequent upon discrimination. I cannot conceive the Legislature would have wanted such a result.

On the other hand, construing the act not to confer jurisdiction for administrative relief for damages for mental distress at all would allow the complainant to get both his specific relief before the agency and his tort-like mental damages, large or small, in an appropriate court. This, it seems to me, is what the Legislature intended, as fairly as one can objectively discern such intent from the statute, its history and purposes and all other relevant indicia.

*For modification*—Chief Justice WEINTRAUB, and Justices JACOBS, MOUNTAIN and PROCTOR—4.

*Dissenting in part*—Justice HALL, and Judges CONFORD and LEWIS—3.

---

[1]By analogy to the law of damages for mental suffering in other contexts, reasonable compensatory awards of thousands of dollars for gross insult arising out of discrimination, especially if involving psychical injury, are readily conceivable.