822 A.2d 647 (2003)
360 N.J. Super. 265
Carol TARR, Plaintiff-Appellant/Cross-Respondent,
v.
BOB CIASULLI'S MACK AUTO MALL, INC., Defendant-Respondent/Cross-Appellant,
and
Bob Ciasulli, Bob Ciasulli Auto Group, Inc., Monmouth Honda Jeep Eagle, Patrick Grimaldi, John Desantis, Steven Fuentas and Joseph Angelini, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued April 8, 2003.
Decided May 19, 2003.
Ronald L. Lueddeke, Spring Lake, argued the cause for appellant/cross-respondent (Mr. Lueddeke and Lynda Lee, on the brief).
Resa T. Drasin argued the cause for respondents/ cross-appellant (Woehling & Freeman, Westfield and Nowell Amoroso Klein Bierman, attorneys; Ms. Drasin and Bradley M. Wilson, on the briefs).
Before Judges PRESSLER, AXELRAD and HOENS.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Plaintiff Carol Tarr brought this hostile work environment sexual harassment complaint against defendant Bob Ciasulli and *648 various of his wholly owned corporations and their employees. Following both voluntary and involuntary dismissals, the only defendant remaining when the case was submitted to the jury was Bob Ciasulli's Mack Auto Mall, Inc. (Mack Auto Mall). By its answer to special interrogatories, the jury found that plaintiff had indeed been the victim of proscribed sexual harassment in the workplace but that she had suffered no economic loss. Although no compensatory damages, and hence no punitive damages, were therefore awarded plaintiff, the court granted plaintiff's attorney a counsel fee concluding that because plaintiff had proved a sexually harassing hostile workplace, she was a prevailing party despite her failure to prove damages. Plaintiff appeals from the dismissal during trial of her claim for emotional distress and from the dismissal of her action as against defendants Bob Ciasulli (Ciasulli), individually, and Bob Ciasulli Auto Group, Inc. (Auto Group). All three defendants appeal from the order granting a counsel fee. We reverse the orders dismissing the emotional distress claim and dismissing the complaint as against Ciasulli individually, and we remand for a new trial on the damages issues, both compensatory and punitive, and for determination of the liability of Bob Ciasulli. We affirm the order dismissing the complaint as to Auto Group, and we affirm the counsel fee order challenged on the cross-appeal.
We address the issues raised by plaintiff in the context of the trial proofs. Because the emotional distress claim and the complaint against Ciasulli and Auto Mall were dismissed at trial for insufficiency of supporting evidence pursuant to R. 4:37-2(b), our inquiry as to those issues is limited to the question of whether the evidence was adequate to demonstrate a prima facie case. And although we recognize that there was evidence to the contrary, we consider the trial proofs, as we are required to, in the light most favorable to plaintiff. See, e.g., Cameco, Inc. v. Gedicke, 157 N.J. 504, 509-510, 724 A.2d 783 (1999); Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969). We conclude that the trial judge took an unduly restrictive view of the requisite elements both of emotional distress in the context of proscribed discrimination and of employer liability in that context. Accordingly, we are satisfied that these claims should have gone to the jury.
This is what plaintiff's proofs show. Plaintiff, experienced in the retail automobile business, began working for Mack Auto Mall in Toms River in late July 1994 as a finance and insurance manager. Her immediate supervisor was a woman, Kelly Signorin Bragg. Bragg's male supervisor was Pat Grimaldi, the general manager of Mack Auto Mall. As we understand the record, at the time of plaintiff's employment, Mack Auto Mall consisted of four separate automobile franchises. The finance and insurance function for all four franchises was centralized in the Pontiac-Cadillac building where plaintiff and Bragg shared space which was partitioned but not entirely closed off from the sales floor. Grimaldi's office was also in that building. The finance and insurance job included supervision of bank contracts, the sale of extended warranties and insurance, and the sale of after-market items. Plaintiff's salary was based on commissions on the sales of these services. The paperwork on automobile sales came to her from the salesman in an envelope referred to as a deal jacket. Plaintiff continued to work in that position until July 1995, when she left, assertedly because of the sexual harassment in the workplace. She returned, however, in August 1995 and remained until April 1996 when she again resigned assertedly for the same reasons.
*649 According to plaintiff's testimony, there was a considerable amount of swearing, cursing, and use of foul language as part of the dealership ambience which she regarded as routine in that business and by which she was not offended. What she did find to be intensely offensive to the point that she could no longer tolerate the working environment was the virtually continuous sexually explicit insults to which she was subjected by several of the male employees; the toleration of this conduct by Grimaldi and indeed his participation therein; and the regularity, in her presence, of degrading sexual conversation among the salesmen and their regular display of pornographic materials. The group of particularly offensive male employees included Chris Tashler, Joe Angelini, Ed Costello, Robert DiSantis and Pete Rinaldi, whose conduct plaintiff referred to as disgusting, horrid, and awful. One or another or all of them habitually referred to women generically in the most demeaning gutter slang. They bragged loudly of their sexual exploits in the most explicit and crudest terms, including exploits with minors, and drew attention to their own genitals. The explicit sexual remarks they made on a daily basis directly to plaintiff were well below the lowest common denominator of decency in both content and language and were made with the sole and successfully executed purpose of causing her intense embarrassment and humiliation. The remarks were, moreover, occasionally made in the presence of third persons not connected with the dealership such as wholesalers who had come to buy used cars. Angelini, who apparently fancied himself as something of an artist, drew sexual organs, both male and female, on the deal jackets he handed over to her for processing. Grimaldi, who heard much of the offensive conversation did not, plaintiff said, make any effort to stop it and himself subjected her to sexual harassment by such conduct as suggesting she further unbutton her blouse in order to sell a warranty and making sexual innuendoes when she bent down to pick something off the floor. She finally left after a particularly crude, degrading, and humiliating remark by Tashler.
Although plaintiff asserted that the sexual harassment had forced her to leave the first time in 1995, she nevertheless returned because she needed a job and Bragg, who was also subjected to the same sexual harassment, had assured her that things had gotten better. While she was, in fact, earning a high salary, she could not, she asserted, remain any longer in that intolerable and abusive environment, she "couldn't take it any more." Bragg, who corroborated plaintiff's testimony, related the sexual harassment to which she was also subjected, maintained that her complaints to Grimaldi on both her own account and plaintiff's were ignored or laughed at, and explained that she left her job shortly after plaintiff did because of the sexual harassment and that she also filed a sexual harassment complaint against Ciasulli. In sum, we are satisfied that our characterization of the sexually explicit remarks as despicable, insulting, reprehensible, crude, gross, demeaning, and contemptible hardly begins to convey the flavor of their affront. None of the male employees testified. Grimaldi, who testified under subpoena served upon him with difficulty, denied any untoward conduct.
Plaintiff's testimony respecting her response to the abusive environment to which she was subjected for as long as she could tolerate it was not extensive. Although she apparently had mental health care after leaving Mack Auto Mall, she chose not to offer expert testimony. She testified only to her acute embarrassment and humiliation, explaining that Tashler's *650 remarks, particularly in the presence of persons not employed by the dealership, made her turn "beet red" and "want to crawl under my desk." And, she testified, she regularly cried in her car "all the way home from being frustrated, from being intimidated, from feeling that you couldn't hardly breathe around there...."
At the close of plaintiff's case, the trial court granted defendants' motion to dismiss the emotional distress claim. It was the trial judge's view that the elements of emotional distress are no different in discrimination cases than in tort cases, that emotional distress is compensable only if it causes discrete physical symptoms of illness or diagnosable psychological sequelae, and that temporary emotional distress is not compensable. We disagree with the trial court's perception. In our view, plaintiff's proofs were sufficient to permit the jury to award her compensatory damages for her intense humiliation and embarrassment.
We recognize that emotional distress, either negligently inflicted by a defendant's tortious conduct or resulting from the intentional tort of outrage, is compensable only if it is severe and substantial, a standard we have defined as mental distress that is not merely transitory but rather has a discernible effect on the plaintiff's ability to function normally, either physically or psychologically, on a daily basis. See, e.g., Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 369, 544 A.2d 857 (1988); Lascurain v. City of Newark, 349 N.J.Super. 251, 280-282, 793 A.2d 731 (App.Div.2002).[1] We need not, however, consider whether plaintiff's proof of her emotional distress met the severe and substantial standard sufficiently to create a jury question. That is so because the claim she makes is based neither on defendants' negligence nor on their commission of the tort of outrage. Rather, it is a claim based on the violation of her constitutionally afforded civil rights whose protection and advancement is the purpose of anti-discrimination laws. We are satisfied, as a matter of long-standing law in this state, the federal courts, and our sister states, that emotional distress suffered by reason of proscribed discrimination is a category distinct and separate from claims of negligent or intentional infliction of emotional distress in other contexts.
We start our analysis with Gray v. Serruto Builders, Inc., 110 N.J.Super. 297, 265 A.2d 404 (Ch.Div.1970), in which the Chancery Division held that the courts have concurrent jurisdiction with the Division on Civil Rights over discrimination cases within the ambit of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1, et seq. The court in Gray also had to deal with damages issues. There, the plaintiff, a black man, had been denied the opportunity to rent an apartment because of his race. He incurred no economic loss. He alleged neither physical symptoms of illness nor diagnosable psychological symptoms. His complaint, rather, sought damages for "`anguish,' `embarrassment' and *651 `personal sense of the attempt of degradation of [plaintiff's] rights as a citizen." Id. at 311-312, 265 A.2d 404. Judge Ward Herbert first noted that "[t]he specific question of money damages for mental suffering caused by racial discrimination has not yet been decided in New Jersey." Id. at 312, 265 A.2d 404. He then proceeded to do so. His analysis started with the premise that civil rights were here at stake and that "[r]acial discrimination is necessarily wilful rather than negligent, and so the harmful results it causes should not have to be proven to be substantial.... Indignity must be the natural, proximate, reasonable and foreseeable result of racial discrimination. As such, it should be held compensable...." Id. at 315, 265 A.2d 404. Judge Herbert then addressed the difference between indignity alone, that is, having to bear the insult of the discriminatory conduct, and, on the other hand, illness, physical or mental, resulting from the conduct, explaining that in the first instance, only "nominal" damages might be appropriate and that in the second, "actual" damages are warranted. Judge Herbert, finding that the plaintiff, educated and sophisticated, had suffered no damages other than the transitory indignity and humiliation of the discriminatory encounter, then canvassed the reported opinions in other jurisdictions that allowed compensatory damages in racial discrimination cases for indignity and humiliation alone. He concluded, in assessing compensatory damages, that $500 would be adequate compensation to the plaintiff. In reaching this figure he noted as well that:
Though our New Jersey cases have placed some stress upon public and rude humiliationfactors not present here those factors, either together or singly, are important because they are likely to produce more severe humiliation and anguish than polite or entirely private forms of discrimination would. Yet such aggravating circumstances are relevant only to the quantum of damages and do not go to the basic question of the availability of damages. [Id. at 317, 265 A.2d 404.]
Three years after Judge Herbert decided Gray, the Supreme Court fully endorsed his humiliation-damages concept in Zahorian v. Russell Fitt Real Estate Agency, 62 N.J. 399, 301 A.2d 754 (1973), a gender-discrimination case, in which the Court affirmed the grant by the Division on Civil Rights of a $750 award to the complainant as compensation for the insult she sustained and her response to that insult when she was denied the opportunity to rent an apartment on proscribed discriminatory grounds. Id. at 406, 301 A.2d 754. The issue before the Court was not the general propriety of a humiliation damage awardthat was assumedbut rather whether the Division on Civil Rights as well as the courts had the authority to make such an award. The Court concluded that "the Director acted fairly within the orbit of legislative delegation to him when he awarded $750 to the complainant as incidental compensatory damages for the pain and suffering inflicted on her." Id. at 416, 301 A.2d 754. We note that in that case, complainant had testified before the Division that the discriminatory conduct had humiliated her and that she also had suffered stomach distress requiring her to consult a physician on several occasions, who diagnosed her problem as "nerves" and offered no treatment. Id. at 404, 301 A.2d 754. It may well be that it was that physical symptom that induced the Director to increase the damages award allowed in Gray by fifty percent.
We have found no reported decision in this state impugning the authority of Gray and Zahorian. Indeed, we find that authority confirmed by the 1990 amendment *652 of N.J.S.A. 10:5-3, the legislative finding section of the LAD, which added this provision:
The legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruption; and adjustment problems, which particularly impact on those protected by this act. Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.
The effect of this provision was considered in Rendine v. Pantzer, 276 N.J.Super. 398, 648 A.2d 223 (App.Div.1994), aff'd as modified, 141 N.J. 292, 661 A.2d 1202 (1995), in which two plaintiffs brought discrimination cases alleging wrongful termination of employment based on their having become pregnant. The award of emotional distress damages to one plaintiff was, by extrapolation, $105,000, and the award to the other was $180,000. Neither plaintiff produced expert corroboration of emotional distress. One plaintiff described her anxiety and stress resulting from the loss of income, fights with her husband about money, occasional insomnia, and feelings of frustration, anger, depression and loss of self-confidence. 276 N.J.Super. at 419, 648 A.2d 223. The other testified to embarrassment and humiliation in having to accept financial help from family, weight gain, loss of self-confidence, bitterness and anger. Id. at 420, 648 A.2d 223. The defendant appealed the trial court's submission of the emotional distress claim to the jury, asserting the insufficiency of the evidence to support those claims and, alternatively, challenged the quantum of the jury's awards by asserting that the evidence could support only nominal damages. Judge King, writing for this court, rejected those arguments pointing out that while neither plaintiff had suffered illness or homelessness, they had both suffered "inconvenience and economic loss, physical and emotional stress, anxiety in searching for reemployment, uncertainty, career and family disruption and other adjustment problems ..." all or any of which were intended by the legislature, in its statement, to be compensable. Id. at 440, 648 A.2d 223. Accordingly, the awards were sustained, and the Supreme Court affirmed. 141 N.J. at 312-313, 661 A.2d 1202.
We appreciate that plaintiff's proved difficulties may have been of a lesser order than those of the Rendine plaintiffs. But that circumstance, in our view, affects only the quantum of compensatory damages, not her right thereto. We are persuaded that the Legislature's inclusion of "emotional stress" as an independent harmful and compensable consequence of discrimination must be construed to include the humiliation, embarrassment and indignity our courts recognized as compensable in Gray and Zahorian. We think it plain that the Legislature could not have intended to curtail the remedies available at common law prior to its 1990 statement. To the contrary, it specifically expressed its intention to preserve them. We regard compensatory damages for humiliation and *653 indignity as one of those preserved common-law remedies.
The question of quantum of damages must, of course, be resolved by the new trial. Beyond what may be regarded as purely nominal damages, i.e., the 1996 equivalent of the $500 allowed by Judge Herbert in a bench trial in 1970, there are additional factors the jury may also consider. These include, in Judge Herbert's terms, the public nature and extreme rudeness of the discriminatory conduct; the many months, as opposed to the single encounter in Gray, during which the plaintiff endured the conduct; the intensity of her humiliation and embarrassment while at work; and the "crying all the way home."
As we have pointed out, the courts of other jurisdictions agree that the transitory emotional distress caused by the humiliation and indignity of discriminatory conduct is compensable. Illustrative is U.S. v. Balistrieri, 981 F.2d 916 (7th Cir.1992), a discrimination case arising under the Fair Housing Act, 42 U.S.C.A. § 3601-3619, in which two black testers of the owner's rental policies had been treated disparately from the white testers. In the resulting litigation, each black tester was awarded $2,000 in compensatory damages for a single encounter, an award the defendant challenged on the basis of insufficiency of evidence of any emotional distress. The court, in affirming the awards, noted that
The evidence of emotional distress is not strong. All of the evidence of emotional distress came from the testers' own testimony. There was no corroboration from any source. Each of the testers testified generally about his or her being upset, humiliated, embarrassed or shamed. [Id. at 931.]
The court then went on to explain that "in determining whether the evidence of emotional distress [in housing discrimination cases] is sufficient to support an award of damages, we must look at both the direct evidence of emotional distress and the circumstances of the act that allegedly caused that distress.... The more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action; consequently, somewhat more conclusory evidence of emotional distress will be acceptable to support an award for emotional distress." [Id. at 932.] See also Krueger v. Cuomo, 115 F.3d 487, 492 (7th Cir.1997). And see Kriss v. Sprint Communications Co., Ltd. Partnership, 851 F.Supp. 1350, 1361 (D.Minn.1994) (compensatory damages of $20,000 allowed under Minnesota anti-discrimination laws to female employee discriminated against on the basis of gender who suffered, as a result thereof, "embarrassment at not being selected [for promotion], as well as the frustration caused by the discriminatory conduct...."); Johnson v. Goodyear Tire & Rubber Co., 790 F.Supp. 1516, 1529 (E.D.Wash.1992) (compensatory damages of $5,000 awarded by court to female employee subject to gender discrimination who produced uncorroborated testimony that she experienced depression and "that the trauma of her discharge has led to an increased sensitivity which causes her to become upset more easily than before.") See also generally Annotation, Sex Discrimination Emotional Distress, 61 A.L.R.3d 944 (1975) and cases cited in supplement services thereto.
In summary, we adhere to the holdings of Gray v. Serruto and Zahorian v. Russell Fitt Real Estate Agency, supra. To suffer humiliation, embarrassment and indignity is by definition to suffer emotional distress. Emotional distress actually suffered in that manner by the victim of proscribed discrimination is compensable *654 without corroborative proof, permanency of response, or other physical or psychological symptoms rendering the emotional distress severe or substantial. The quantum of compensation, which may be nominal in the terms we have described, is dependent upon the relevant factors we have identified including duration of the discriminatory conduct, its public nature, and its content and may be enhanced by such additional proofs of indicia of suffering as plaintiff may adduce. We add only that the duration and the content of the conduct asserted here clearly, in our view, warrants an award in some amount. No reasonable woman can be expected to have endured the constant and prolonged barrage of the extraordinarily demeaning and degrading sexual harassment to which this plaintiff was subjected without humiliation, embarrassment and loss of personal dignity and that was the emotional distress to which she testified. We leave the question of quantum to the fact finder.
We add only a brief comment respecting economic damages. Plaintiff obtained a new job as a finance and insurance manager with another dealership immediately upon leaving Mack Auto Mall. While she earned less at that job than she had at Mack Auto Mall, the new job was only part-time. The jury was free to find from the evidence that working part-time was plaintiff's preference and at her request. Evidently it did so find, and that is the reason it awarded no economic damages for loss of income. Such economic damages were, as noted, the only element of damages that had been submitted to the jury. Since that issue has been adjudicated, it need not be relitigated on the remand. The new trial on compensatory damages is to be limited to non-economic damages for emotional distress.
We address next the issue of the liability of Bob Ciasulli individually and Auto Group. It appeared, as a matter of colloquy but not of proof, that Auto Group, a wholly owned company of Ciasulli, was an umbrella or holding company for many separate automobile franchises owned by Ciasulli in corporate form. It is, however, clear and undisputed that Ciasulli was the sole stockholder and chief executive officer not only of Auto Group but also of Mack Auto Mall, the corporate entity by which plaintiff was employed. The question then, in LAD terms, is whether Ciasulli can be held liable for the discriminatory conduct of the other Mack Auto Mall employees.
In reviewing the record, we are satisfied that Ciasulli maintained control and supervision over this as well as his other franchises. He held monthly meetings over which he presided with the sales and managerial staffs of all the franchises. Plaintiff was required to and did attend. He sent videotapes he had made to the franchises to be viewed by the employees at their weekly meetings. He appeared from time to time unannounced at Mack Auto Mall to review its operations. He was the end of the line of hierarchial supervision for Mack Auto Mall. He was the boss. There is thus no doubt, a conclusion corroborated by his own testimony, that he controlled, supervised, and set the tone of the business of Mack Auto Mall.
As we understand the trial court's reason for dismissing the complaint against Ciasulli, it was based simply on plaintiff's failure to show that he had personal knowledge of the workplace sexual harassment and her never having complained to him directly about it. We think it clear, however, that liability of management does not require personal knowledge of sexual harassment. The Supreme Court in Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 621, 626 A.2d 445 (1993), instructed that "a plaintiff may show that an employer was *655 negligent by its failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms." See also Gaines v. Bellino, 173 N.J. 301, 319, 801 A.2d 322 (2002); Velez v. Jersey City, 358 N.J.Super. 224, 234-235, 817 A.2d 409 (App.Div. 2003).
During the time of plaintiff's employment, as Ciasulli himself confirmed, there was no employee handbook of any kind and no formal written policy respecting sexual harassment. Rather, he communicated company policies and directives to his employees by individual memoranda, none of which addressed the subject of sexual harassment. There was no complaint mechanism in place. Although the Mack Auto Mall, as all the other franchises, had a poster with a number to call in the case of complaint, there was contrary evidence as to whether that invitation was extended to employees as well as to customers, at least some employees believing that it was not. There was no designated person to take personnel complaints. There was no monitoring and no training.
There were other indicia as well of Ciasulli's negligence as a supervisor in respect of addressing sexual harassment in the work place. We refer first to the testimony of Salvatore Belluardo who held a managerial position at Mack Auto Mall. While the dates of his employment were not precisely defined, he testified that at the time he left, plaintiff was still working there. He recounted an incident, which must, therefore, have occurred prior to his departure and during plaintiff's term of employment, in which a female employee came to him, "completely hysterical" and "very, very upset," complaining to him about a sexually explicit remark made to her by "one of the salespeople." She also told him that "her father ... worked for the Attorney General's office or something." For that reason, the father's employment, Belluardo regarded the matter as "serious" and "I called Mr. Ciasulli and I told him about the incident." Ciasulli's response, according to Belluardo, was "[w]e don't need any crap on our back like that. Get rid of him." Belluardo then fired the offender. While Ciasulli's prompt response in that instance may be laudable, the fact remains that Belluardo's report to him of the incident is obviously construable as notice to him, during the period of plaintiff's employment, that there was sexual harassment going on at Mack Auto Mall which needed to be addressed as a general matter of policy and not simply on an ad hoc basis because of the threat of the Attorney General's involvement. Sexual harassment apparently was, however, not addressed as a policy matter until some time after plaintiff left.
There were other indications of Ciasulli's attitude towards sexual harassment suggestive of his negligence in not attempting to adopt and implement an appropriate policy. During the course of his testimony he referred to the actions of the five or so women who had ultimately filed discrimination complaints against him or his companies as "bottom feeding and screwing up the whole economy." A former employee also testified that at the monthly meetings, Ciasulli exhorted the salespeople to "take money away" from female decision makers because "women are stupid." In short, we are satisfied that there was abundant evidence from which the jury could have concluded that Ciasulli was the ultimate supervisor, the top management, whose acts both of omission and commission could have been found by the jury to have contributed to the creation of the hostile workplace. See also Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 127, 735 A.2d 548 (1999).
*656 As to the final issues raised, we affirm the dismissal of the action against Auto Group because there was no proof of the relationship between that corporation and Mack Auto Mall. With respect to the issue of counsel fees, we have no doubt of plaintiff's status as a prevailing party. In proving the hostile workplace sexual harassment, her efforts vindicated the policy of the LAD. Beyond that, our determination that she is entitled to compensatory damages effectively moots defendants' argument that she cannot be deemed to have prevailed in the absence of a compensatory award. Nor do we see any reason to interfere with the trial judge's assessment of the quantum of fees to be allowed.
With respect to punitive damages, plaintiff's entitlement thereto will depend on the proofs offered at retrial and her meeting of the standards of the Punitive Damages Act, N.J.S.A. 2A:15-5.9. We merely note in this regard that "nominal damages" not supporting an award of punitive damages is defined by N.J.S.A. 2A-15-5.10 as "damages that are not designed to compensate a plaintiff and are less than $500."
The orders dismissing the claims of emotional distress and dismissing the complaint against Bob Ciasulli individually are reversed. The orders dismissing the complaint against Bob Ciasulli Auto Group, Inc., and awarding counsel fees are affirmed. We remand for a new trial in accordance with this opinion.
NOTES
[1] We note that there may be some confusion respecting the nature of compensable emotional stress in the tort context that has resulted from the principle in insurance cases that emotional distress damages are included within bodily injury coverage only if the emotional injury is accompanied by physical manifestations. See, e.g., Schmidt v. Smith, 155 N.J. 44, 52, 713 A.2d 1014 (1998); Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 179, 607 A.2d 1255 (1992). Compensable emotional stress in the tort context, contrary to the bodily-injury coverage context, need not be accompanied by physical manifestations. It need only be severe and substantial although, of course, accompanying physical manifestations are relevant both in proving that the emotional distress was severe and substantial and in assessing the quantum of damages.